**TELESAT CABLEVISION, INC., Plaintiff,**

**v.**

**The CITY OF RIVIERA BEACH, Defendant.**

**GWC 104, INC., Plaintiff,**

**v.**

**The CITY OF RIVIERA BEACH FLORIDA, Defendant/Third–Party Plaintiff,**

**v.**

**TELESAT CABLEVISION, INC., Third–Party Defendant.**

Nos. 87–8207–CIV, 87–8208–CIV.

United States District Court, S.D. Florida.

Sept. 13, 1991.

Thomas R. Julin, Norman Davis, Adalberto Jordan, Steel Hector & Davis, Miami, Fla., for plaintiff Telesat Cablevision, Inc.

Terry S. Bienstock, James C. Cunningham, Jr., Frates Bienstock & Sheehe, Miami, Fla., for defendant City of Riviera Beach.

Christopher Redding, Daw, Lohnes & Albertson, Washington, D.C., for defendant intervenor GWC 104, Inc.

## ORDER GRANTING SUMMARY JUDGMENT TO CITY OF RIVIERA BEACH AND GWC 104, INC.

MARCUS, District Judge.

THIS CAUSE comes before the Court upon Plaintiff Telesat Cablevision Inc.'s ("Telesat") Renewed Motion for Partial Summary Judgment filed on March 19, 1990, Defendant City of Riviera Beach's ("City") Motion for Partial Summary Judgment also filed on March 19, 1990, and Defendant Intervenor GWC 104, Inc.'s (hereinafter "Comcast") Motion for Partial Summary Judgment. At issue today is a broad-based attack on the City's codified efforts to regulate cable franchises within its boundaries. Upon reviewing the pleadings and hearing extensive argument, this Court has determined that the Ordinance at issue falls within the lawful power of the municipality to regulate cable television, and that its provisions are consonant with the Constitution and statutory enactments of Congress and the State of Florida. Accordingly, Plaintiff's Motion must be DENIED, Defendant's Motion must be GRANTED, and Defendant Intervenor's Motion must be GRANTED. We reach this decision for the following reasons.

## I. *Factual Background*

This consolidated action arises from a long-standing dispute between the parties regarding Telesat's efforts to enter the cable television business in the City of Riviera Beach. In early 1985 several condominium associations located on Singer Island within the City of Riviera Beach contacted Telesat regarding the possibility of Telesat providing cable service to its residents. Soon thereafter, Telesat entered into contracts with four condominiums located along State Road Alt. A1A to provide cable service. Initially, Telesat employed temporary satellite dishes placed on the premises of three of the four serviced buildings in order to provide service to the contracting condominiums. Service to the fourth building was provided through the use of a cable running from a satellite dish located on the property of an abutting building. At the time, Telesat did not possess a permit to run cable along public rights-of-way.

In May 1986, Telesat decided to apply to the City for a franchise to operate a cable system using public rights-of-way within the city. Although the City had not instituted formal procedures to evaluate applications for cable television franchises, two companies were operating cable franchises within Riviera Beach. The City had previously granted franchises to Teleprompter Corporation, subsequently acquired by Comcast, and Perry Cable T.V. Throughout the summer of 1986, representatives from Telesat met with city officials to try to reach agreement on terms for a franchise agreement between Telesat and the City. After four months of negotiations, the City and Telesat reached agreement on a proposed franchise contract. On September 10, 1986, the City Council reviewed the proposal, suggested changes and scheduled a vote for September 17, 1986, to approve the application. Prior to the scheduled final vote, representatives of Comcast contacted the City and requested the opportunity to make a presentation in opposition to Telesat's application for a franchise. Pursuant to this request, the City Council rescheduled consideration of Telesat's application.

On October 1, 1986, the City Council deferred action on Telesat's application pending a study of the Palm Beach County cable franchising ordinance. At that time, City staff conducting the study were instructed to report back to the City Council in ninety days. By early December 1986 Telesat was under considerable pressure from condominium owners to construct a cable system in order to eliminate the need for the use of temporary satellite dishes on condominium property. Telesat had previously obtained a permit from the Florida Department of Transportation ("DOT") to build its cable system along the Alt. A1A right of way. Despite the inaction of the City Council on its application for a franchise, Telesat obtained a building permit from the City on December 16, 1986. With its building permits from DOT and the City in hand, Telesat commenced construction of a cable system along Alt. A1A on the day it obtained its City building permit, notwithstanding that a cable franchise had not been awarded by the City.

On December 18, 1986, Comcast became aware that Telesat had started installing a cable system on Singer Island and complained to the City about it. City Manager William Wilkens proceeded to inform Telesat that it must cease construction of the cable system because it lacked a City cable franchise. In accordance with Wilken's order, Telesat immediately halted work on the system.

On December 24, 1986, Telesat notified the City of its intention to seek an injunction restraining the City from interfering with Telesat's construction of a cable system along the Alt. A1A right of way. Upon receipt of this notification, the City requested that Telesat refrain from bringing an action until the City Council had an opportunity to reconsider Telesat's application. On January 7, 1987, in accordance with the recommendation of the City Attorney, the City Council approved a resolution authorizing the City Attorney to sign an agreement with Telesat whereby Telesat would agree to abstain from bringing an action against the City in return for the City's agreement to grant Telesat a city-

wide cable franchise. Pursuant to the City Council's action, the City Attorney and a representative of Telesat entered into a franchise agreement on January 15, 1987. As a result of this agreement, Telesat was given the right to maintain a cable system throughout the City of Riviera Beach. On February 4, 1987, Telesat completed construction of the system on Singer Island and commenced providing cable service to residents of the Island.

Rather than ending the dispute over cable franchising in Riviera Beach, the grant of the franchise to Telesat set off a new wave of controversy. On January 30, 1987, Comcast sued the City in Palm Beach County Circuit Court, contending that the City had employed improper procedures in approving the franchise agreement with Telesat. Comcast's suit sought the following relief: (1) a declaration that the City Council failed to follow City Code requirements regarding execution of contracts; (2) an injunction enjoining the City from allowing Telesat to construct a cable system within the City; and (3) damages in excess of $5,000. At the same time, Comcast also filed a motion for a temporary injunction enjoining the effectiveness of the City's franchise agreement with Telesat.

On February 11, 1987, the state court entered a temporary injunction ordering that the City "is enjoined from proceeding under said contract unless and until it presents the Court a contract which complies with its code and is further enjoined from allowing any third party with which it has attempted to contract, from preceding under the terms of the alleged contract." Temporary Injunction Case No. CA 87–843 AI, *reprinted in* Plaintiff's Appendix to First Motion for Partial Summary Judgment at 428–30. On February 27, 1987, counsel for Comcast wrote to the City complaining that Telesat was continuing to provide cable service on Singer Island despite the fact that the state court had entered an order declaring Telesat's franchise invalid. Following notification from Comcast, the City sent counsel for Telesat a letter advising Telesat of the state court injunction and ordering Telesat to cease violating the injunction. Despite the letter from the City, Telesat continued operation of its cable system. On March 5, 1987, Comcast orally threatened to seek contempt proceedings due to the City's failure to take further action to compel Telesat to discontinue operation of its cable system.

On March 12, 1987, the City filed a Third Party Complaint against Telesat in Palm Beach County Circuit Court, alleging that Telesat did not have a valid cable franchise and therefore was barred from providing cable service under both the state court injunction and the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 (1984) ("Cable Act"). The action sought (1) a declaration that Telesat illegally operated a cable television system within the City, and (2) a temporary and permanent injunction prohibiting Telesat from continuing to operate within the City until it obtained a valid and legal franchise. Third Party Complaint filed in Case No. CA 87–843 AI, *reprinted in* Plaintiff's Appendix at 431–33. Telesat removed this state court action to federal court on March 23, 1987.[1] On the same day that Telesat removed the state court action, Telesat filed suit in federal court seeking preliminary and permanent injunctive relief prohibiting the City from interfering with Telesat's provision of cable service within Riviera Beach.[2]

During the early pendency of this action, the Florida Legislature took up the matter of the regulation of cable franchises. On June 4, 1987, the Governor of Florida signed Florida Statute Section 166.046 into law. That statute establishes standards to be employed by municipalities within the state when granting cable television franchises.[3]

---

1. This action constitutes Case No. 87–8208 now before the Court.

2. This action is Case No. 87–8207. By order of April 6, 1987, we consolidated the two actions.

3. The statute provides as follows:

**166.046. Definitions; minimum standards for cable television franchises imposed upon counties and municipalities**
 (1) As used in this section, the term:

On July 1, 1989, shortly after Fla.Stat. § 166.046 became law, the City enacted Ordinance No. 2335 which established Article C of Chapter 11 of the City Code. The City Cable Ordinance requires that parties who wish to provide cable service within the city must obtain a cable franchise from the City. In addition, the Ordinance sets forth detailed procedures and criteria for determining if an individual application for a franchise should be granted. The Ordinance sets forth various requirements that parties wishing to receive a cable franchise

(a) "Cable service" means:
1. The one-way transmission to subscribers of video programming or other programming service; and
2. Subscriber interaction, if any, which is required for the selection of such video programming or other programming service.
(b) "Cable system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include:
1. A facility that serves only to retransmit the television signals of one or more television broadcast stations;
2. A facility that serves only subscribers in one or more multiple-unit dwellings under common ownership, control, or management, unless such facility or facilities use any public right-of-way;
3. A facility of a common carrier, except that such facility shall be considered a cable system to the extent such facility is used in the transmission of video programming directly to subscribers; or
4. Any facilities of any electric utility used solely for operating its electric utility systems.
(c) "Franchise" means an initial authorization or renewal thereof issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system.
(d) "Franchising authority" means any governmental entity empowered by federal, state, or local law to grant a franchise.
(e) "Person" means an individual, partnership, association, joint stock company, trust, corporation, or governmental entity.
(f) "Video programming" means programming provided by, or generally considered comparable to programming provided by, a television broadcast station or cable system.
(2) No municipality or county shall grant a franchise for cable service to a cable system within its jurisdiction without first, at a duly noticed public hearing, having considered:

must meet and fees that they must pay in order to receive favorable consideration from the City. The broad application requirements of the statute are as follows:

(1) demonstration of sufficient financial capability to construct the cable system; (2) demonstration of a sufficient level of financial feasibility for successful operation; (3) demonstration of the technical excellence of the proposed system; (4) information concerning the potential for disruption of existing utilities and rights-

(a) The economic impact upon private property within the franchise area;
(b) The public need for such franchise, if any;
(c) The capacity of public-rights-of-way to accommodate the cable system;
(d) The present and future use of the public rights-of-way to be used by the cable system;
(e) The potential disruption to existing users of the public rights-of-way to be used by the cable system and the resultant inconvenience which may occur to the public;
(f) The financial ability of the franchise applicant to perform;
(g) Other societal interests as are generally considered in cable television franchising;
(h) Such other additional matters, both procedural and substantive, as the municipality or county may, in its sole discretion, determine to be relevant.
(3) No municipality or county shall grant any overlapping franchises for cable service within its jurisdiction on terms or conditions more favorable or less burdensome than those in any existing franchise within such municipality or county.
(4) The provisions of subsection (3) shall not apply when the area in which the overlapping franchise is being sought is not actually being served by any existing cable service provider holding a franchise for such areas. The provisions of subsection (2) shall apply to the provisions of this subsection and subsection (5). As used in this subsection, the term "actually being served" means that cable service is actually available to subscribers to such extent that the only act remaining in order to provide cable service is the physical connection to the individual subscriber location as of 15 days prior to any subsequent application for a franchise.
(5) Nothing in this section shall be construed to prevent any municipality or county considering the approval of an additional cable service franchise in all or any part of the area of such municipality or county from imposing additional terms and conditions upon the granting of such franchise as such municipality or county shall in its sole discretion deem necessary or appropriate.
(6) All cable service franchises in existence as of October 1, 1987, shall remain in full force and effect according to their terms.

of-way caused by installation of the proposed system; (5) information demonstrating the rate and feasibility of the construction schedule for the proposed installation as well as the applicant's commitment to upgrading the system; (6) information concerning the applicants familiarity with the area to be served; (7) information demonstrating the extent to which the existing cable systems within the community are meeting community needs and interests; (8) such other information as the City Council may require in order to adequately evaluate the application.

*See* City Ordinance No. 2335 § 11C–1.12, *reprinted in* Plaintiff's Appendix to first Motion for Partial Summary Judgment, at 546–61.

The Ordinance further provides for the following considerations to be employed by the City Council in determining the "impact and viability of multiple cable system grantees serving the City":

A. The capacity of public rights-of-way to accommodate the cable system;

B. The present and future use of the public rights-of-way to be used by the cable system;

C. The potential disruption to existing users of the public rights-of-way to be used by the cable system and the resultant inconvenience which may occur to the public;

D. The financial ability of the franchise applicant to perform;

E. The potential additional long-term benefits to subscribers;

F. The potential adverse effect on financial and operating capability of current franchisees and their capability to provide quality service and system expansion; and

G. Other societal interests as are generally considered in cable television franchising.

City Ordinance No. 2335 § 11C–1.3.

In addition to providing standards and procedures for the application and granting of cable franchises, the Ordinance also establishes requirements for the operation of franchises which are granted under the Ordinance. The Ordinance provides that grantees must meet the following requirements, among others:

(1) all areas currently served by another cable system must be served by the grantee as well within thirty-six months of the date the franchise is granted; (2) all portions of the franchise area not currently served by another cable system must be served within twelve months of the date the franchise is granted; (3) the grantee's cable service must be uniform and non-discriminatory as to rates, programming and signal quality throughout the franchise area; (4) franchises are to be granted for a period of no more than fifteen years with renewals available for no more than ten years; (5) access to cable service may not be denied to any group of potential subscribers because of the income of the residents of the area in which such group resides; (6) grantees must pay the city five percent of the gross revenue received from service within the city; (7) each franchisee is required to post a corporate surety bond with the city; (8) grantees must maintain adequate insurance to cover potential liability resulting from operation of the system; (9) grantees must indemnify and hold the City harmless from all liability arising out of, or pertaining to, the installation of grantee's facilities and the operation of the cable system within the city; (10) all transfers and sales of franchises must be approved by the city; (11) all grantees must meet various service requirements established by the Ordinance; (12) free basic service must be provided to schools and other public buildings; (13) in case of an emergency, all franchisees must make their facilities available to the City; (14) grantees must meet safety criteria established by the Ordinance; (15) franchisees must invoke non-discriminatory employment practices; (16) the city must be provided with the right to inspect various aspects of the franchisees operation; (17) the grantee must provide one channel on its cable system for the sole use of the City and its designees; (18) Thirty days notice of

changes in services rates must be provided to the public.

*See* City Ordinance No. 2335 §§ 11C–1.4—11C–1.16.

On July 27, 1987, the interim city manager sent Telesat a letter suggesting that it apply for a franchise under the recently enacted Ordinance. After protracted negotiations, during which time the lawsuit was held in abeyance, the City and Telesat were not able to agree on terms by which Telesat would be granted a franchise. On May 27, 1988, Telesat moved for leave to file an Amended Complaint alleging facts which had occurred subsequent to the filing of the original complaint, including the enactment of the City's Cable Ordinance. Telesat's original claim for relief was supplemented by a request for a broad declaration that Ordinance No. 2335 and any attempts by the City to enforce the Ordinance be declared unconstitutional, and by a request for an injunction against the City's enforcement of the Ordinance. *See* Plaintiff's Motion to Amend Complaint and Amended Complaint. By Order of August 18, 1988, this Court granted Plaintiff leave to amend the complaint. By Order of January 12, 1990, we denied Plaintiff's Motion for Partial Summary Judgment. We now consider the cross-motions for partial summary judgment filed by all parties.

## II. *Summary Judgment Standard*

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

The judgment sought shall be rendered forthwith if the pleading, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

It may be entered only where there is *no* genuine issue of material fact. Moreover, the moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In applying this standard, the Eleventh Circuit recently explained:

In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; [*Environmental Defense Fund v.*] *Marsh,* 651 F.2d [983] at 991. [ (5th Cir.1981) ]. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.,* 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronics [Electronic Techniques, Inc. v. Wackenhut Protective Systems Inc.],* 669 F.2d [1026] at 1031 [ (5th Cir.1982) ]; *Croley v. Matson Navigation Co.,* 434 F.2d 73, 75 (5th Cir.1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh,* 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleading or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611–12 (5th Cir.1967). *See Dalke v. Upjohn Co.,* 555 F.2d 245, 248–49 (9th Cir.1977).

*Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368–69 (11th Cir.1982); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502 (11th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

The United States Supreme Court has recently provided significant additional guidance as to the evidentiary standard which trial courts should apply in ruling on a motion for summary judgment:

> [The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court in *Anderson* further stated that "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. at 2512. In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* at 254, 106 S.Ct. at 2513. If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.* at 254–55, 106 S.Ct. at 2513.

In another case, the Supreme Court has declared that a non-moving party's failure to prove an essential element of a claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will *bear* the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added). In the sections to follow, the Plaintiff's and Defendant's claims for Summary Judgment will be evaluated separately against this standard.

### III. *Analytic Framework*

This case squarely raises the question whether the Defendant City's detailed Ordinance violates the free speech and press provisions of the First Amendment to the Constitution. For the reasons detailed at length below we hold that the City's regulation of cable television neither violates the command of the First Amendment nor the statutory framework created by Congress or the State of Florida for the regulation of cable television.

 Initially, the parties have disagreed about the appropriate legal standards for measuring the constitutionality of the City's Ordinance. The Defendant City of Riviera Beach argues that since the aerial and underground rights-of-way impacted by cable operators' activities are non-public forums, the regulations at issue only must be rationally related to some reasonable government interest. *See* City's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, at 21–22.[4] On the other hand, the Plaintiff

---

**4.** The City also suggests that its ordinance would pass constitutional muster even if measured

against the heightened scrutiny provided by the substantial government interest analysis embod-

Telesat argues that a public forum analysis is not appropriate here, but even if it were used, the property at issue should be classified either as a traditional or a limited public forum and thus the regulations must meet more than a rational basis test. *See* Telesat's Memorandum in Opposition to the City's & GWC 104's Motion for Partial Summary Judgment, at 21. Telesat suggests, however, that a forum classification analysis fails to provide sufficient guidance. While Telesat allows that the First Amendment does not absolutely prohibit regulation of cable television, it asserts that with respect to content-neutral speech, the government may lawfully regulate only where necessary to serve substantial governmental interests and may not regulate more broadly than necessary to serve that interest. *See* Opposition Memorandum at 26. Though Plaintiff does not cite directly to *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (upholding conviction of demonstrator convicted of burning draft card), the standard of review Plaintiff describes is much like the one articulated by the Supreme Court in *O'Brien*. *Id.* at 376–77, 88 S.Ct. at 1679. Indeed, Defendant/Intervenor Comcast explicitly adopts the *O'Brien* analysis in its Memorandum of Points and Authorities in Support of [Its] Motion for Partial Summary Judgment, at 3–4.

At the outset, we observe that under a traditional public forum analysis, the property at issue is *not* strictly speaking a public forum. The determination of whether the Constitution compels the government to permit access to property is often said to be controlled by the nature of the property itself. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983) (First Amendment not violated when access to interschool mail system is granted to one teachers' union and denied to its rival). If the property is a traditional public forum or limited public forum, governmental regulations which impinge on First Amendment rights must be "necessary to serve a compelling state interest and . . . [be] narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981).

While we believe the regulations at issue satisfy even a substantial state interest test, the public property in the instant case is a non-public forum. Cable operators do not use the City's streets or parks or other traditionally public open space to provide cable service. *See generally Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Rather, the cable operators use the airspace above and/or the land beneath the public rights-of-way.[5] All the public rights-of-way within the City of Riviera Beach are owned by a governmental body, either the City of Riviera Beach, Palm Beach County, or the State of Florida. Affidavit of L. John Samadi, City Engineer for the City of Riviera Beach, Aug. 2, 1990, at 2.[6] Such aerial and underground government owned rights-of-way have been used traditionally for the provision of public utilities such as

---

ied in *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). *See* Defendant City of Riviera Beach Memorandum at n. 51.

**5.** To deliver a cable television signal to a subscriber, the cable operator receives a satellite signal on its head-end, or satellite dish. The signal is then sent throughout the community on the cable operator's main cable trunk line. The signal from the main cable trunk line is split off at a pedestal for the delivery of the signal to individual subscribers. From the pedestal, a line is taken to each subscriber's home. Affidavit of Carl Pilnick, City of Riviera Beach telecommunications expert, February 28, 1989, at 34. *See, e.g., American Television and Communications Corp. v. Floken, Ltd.*, 629 F.Supp.

1462 (M.D.Fla.1986); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376 (N.D.Ohio 1983).

**6.** Telesat disputes that the rights-of-way at issue are owned by the City. *See* Telesat's Statement Controverting Facts Which The City & GWC 104 Contend Are Not Disputed, at 9. In fact, Telesat maintains that any assertion that the City owns such property is "a purely legal conclusion unsupported by any facts in the record." *Id.* However, Telesat has not presented any facts to show otherwise. Moreover, the City offers Mr. Samadi's affidavit, which states not that all public rights-of-way are owned by the City, but rather, that all are owned by a governmental body. It has also offered the affidavits of Carl Pilnick on related matters.

telephone service, electric utility service, gas service, water delivery service, and raw sewage disposal. Affidavit of Carl Pilnick, cable television expert for City of Riviera Beach, Feb. 28, 1989, at 16, 20.

If the public property is a non-public forum, government regulations which impinge on First Amendment rights are said to meet constitutional standards so long as they are "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. *See also Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788, 808, 105 S.Ct. 3439, 3452, 87 L.Ed.2d 567 (1985) ("[T]he decision to restrict access to non-public forum [must be] reasonable; it need not be the most reasonable or the only reasonable limitation."); *International Soc. for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Auth.*, 691 F.2d 155, 160 (3d Cir.1982) ("Government restrictions on a nonpublic forum are not evaluated by the [significant government interest] standard. *U.S. Postal Service v. Council of Greenburgh Civic Ass'n*, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981). Instead, the government may prohibit all forms of communication so long as the ban is reasonable and content-neutral. *Id.* at 131, n. 7, 101 S.Ct. at 2686 n. 7; *Greer v. Spock*, 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976).").

The character of the aerial and underground rights-of-way used by cable operators clearly suggests that the public property at issue is a non-public forum. It is government-owned property which has neither been traditionally nor specifically open for the exercise of First Amendment rights. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 954. Indeed, the Supreme Court has rejected a suggestion that utility poles are public fora. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (Los Angeles Municipal Code section which prohibited posting of signs on public property was constitutional, public property at issue was not public forum, problem addressed by ordinance constituted a significant sub-

stantive evil within the City's power to prohibit). Certainly, aerial and underground public property in which such poles are placed would also fit such a categorization. The Court in *Vincent* observed:

Appellees' reliance on the public forum doctrine is misplaced. They fail to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks ... the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted....

*Id.* at 814, 104 S.Ct. at 2133. The Third Circuit Court of Appeals stated in *International Society for Krishna Consciousness:*

Not all public places are public forums. The Supreme Court has emphasized repeatedly that a place owned or controlled by the government does not become a public forum simply because members of the public are freely permitted to visit it.... "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."

691 F.2d at 159, *citing Adderly v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). *See also United States Postal Service v. Council of Greenburgh Civic Ass'n*, 453 U.S. at 129–30, 101 S.Ct. at 2685.

In our Order of January 12, 1990, we observed that governmental regulation of cable franchising was lawful and permissible. In *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986), the Supreme Court compared the regulation of cable franchising with the fairness doctrine regulations applied to radio broadcasting, which were upheld in *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The Court observed:

Respondent's proposed activities would seem to implicate First Amendment interests as do the activities of wireless broadcasters, which were found to fall

within the ambit of the First Amendment in *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. at 386 [89 S.Ct. at 1804], even though the free speech aspects of the wireless broadcasters' claim were found to be outweighed by the Government interests in regulation by reason of the scarcity of available frequencies.

Of course, the conclusion that respondent's factual allegations implicate protected speech does not end the inquiry. "Even protected speech is not equally permissible in all places at all times." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 799, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Moreover, where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests. *See, e.g., Members of City Council v. Taxpayers for Vincent*, at [104 S.Ct. 2118]; *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

*Id.* 476 U.S. at 494–495, 106 S.Ct. at 2038.

In our previous Order, we also stated that regulation of cable television franchises may be justified on both physical scarcity and public disruption grounds. As we noted at that time:

> The regulation of cable television presents somewhat parallel, although not identical, considerations to those which have been found to justify the regulation of radio broadcasting. We begin by observing that cable television is not encumbered by the scarcity of available frequencies which plays such a vital role in the consideration of radio broadcasting regulation. However, cable television is affected by unique problems involving both physical scarcity and public disruption. Similar to the way in which the finite number of frequencies along the radio spectrum justify certain types of broadcasting regulation, these problem[s] of physical scarcity and public disruption may justify regulation of cable franchising in certain situations.

Order of January 12, 1990, at 17. As the Supreme Court concluded in remanding the case to district court in *Preferred Communications*, 476 U.S. at 495, 106 S.Ct. at 2038:

> We think that we may know more than we know now about how the constitutional issues should be resolved when we know more about the present uses of the public utility poles and rights-of-way and how respondent proposes to install and maintain facilities on them.

It is clear that important aspects of this lawsuit relate to *public disruption* and *physical scarcity* issues attendant to the installation and maintenance of this new cable system, rather than to the specific kind of *forum* space which the cables at issue will occupy. There is no question that the property to be disrupted and about which scarcity questions have been raised is *public property*, regardless of whether it is a public forum. In the instant action, we now know enough on the full record before us to conclude that the government has articulated an altogether reasonable basis for regulating cable operators due both to physical scarcity and public disruptions concerns. If measured against this standard, we would have little difficulty finding the Ordinance constitutional.

We also conduct our analysis, however, under the more exacting *O'Brien* umbrella. *See United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673. In doing so, we follow the standard applied by the Supreme Court and other circuits in several similar cases. We do so also because there is little question that Telesat's proposed activities implicate First Amendment interests. The *O'Brien* standard has been employed where content-neutral regulation with incidental impact on speech is applied to govern conduct on public property. *See, e.g., Vincent*, 466 U.S. at 804, 104 S.Ct. at 2128 (In *O'Brien*, "the Court set forth the appropriate framework for reviewing a viewpoint-neutral regulation of this kind...."). *See also Leathers v. Medlock*, — U.S. ——, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991) ("Cable television provides to its subscribers news, information, and entertainment. It is engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press.' "); *Chicago*

*Cable Communications v. Chicago Cable Comm'n*, 879 F.2d 1540, 1548 (7th Cir.1989) ("As other courts have held, *O'Brien* is an appropriate standard-bearer for dealing with questions of local regulation of cable television."); *Omega Satellite Products Co. v. Indianapolis*, 694 F.2d 119, 128 (7th Cir.1982); *Community Communications Co. v. Boulder*, 660 F.2d 1370 (10th Cir. 1981) (First Amendment concerns raise substantial interest questions for both plaintiff cable operators and defendant city); *Erie Telecommunications v. City of Erie*, 659 F.Supp. 580, 599–601 (W.D.Pa. 1987); *Carlson v. Village of Union City, Mich.*, 601 F.Supp. 801, 810 (W.D.Mich. 1985).

Accordingly, we also analyze the regulations under the *O'Brien* rubric, as to four factors: (1) are the regulations within the constitutional power of the Government; (2) do they further an important or substantial government interest; (3) is the government interest unrelated to freedom of expression; and (4) is any incidental restriction on such expression no greater than essential. When measured against the *O'Brien* standard, we conclude that the regulations enacted by the City are constitutional.

### IV. *Substantial Government Interest Factors*

The City's regulations were not enacted with the "suppression of speech [a]s a *predominant purpose.*" *Pacific West Cable Co. v. Sacramento*, 672 F.Supp. 1322, 1331 (E.D.Cal.1987), *citing City of Renton v. Playtime Theatres*, 475 U.S. 41, 45–49, 106 S.Ct. 925, 927–30, 89 L.Ed.2d 29 (1986). The City's cable ordinance does not require any applicant to disclose its intended speech. Rather, the City requires only that in using its rights-of-way, regardless of the intended speech, Telesat do so in a non-discriminatory manner.

We find that each of the sections of the Ordinance falls within the constitutional power of government to regulate and is intended to serve a substantial government interest. Moreover, the regulations are not directed toward controlling the speech of any cable operator. Indeed, the Congress recognized such legitimate government interests in enacting the Cable Act, stating that a "significant purpose of [the Cable Act] is to address the problems which have arisen in the franchise process, and to provide and delineate within Federal legislation the authority of Federal, state and local governments to regulate cable systems." H.R.Rep. No. 934, 98th Cong.2d Sess. 22, *reprinted in* U.S.Code Cong. & Admin.News 1984, 4655, 4659.

In our January 12, 1990 Order, this Court recognized two broad reasons justifying regulation of cable television: physical scarcity and public disruption. Each of the regulations which Telesat has challenged is designed specifically to address problems identified by Congress in the Cable Act, cable law requirements of the Florida legislature, particularly Section 166.046 of the Florida Statutes (1987), and regulations of Palm Beach County. *See* Affidavit of Carl Pilnick, President of Telecommunications Management Corp., an independent cable television and telecommunications consultant, and expert witness for City of Riviera Beach, filed February 28, 1989, at 10.

### A. *Physical scarcity*

In *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), Justice Frankfurter, writing for the Court, observed that because radio facilities were "limited and therefore precious, they cannot be left to wasteful use without detriment to the public interest." *Id.* at 217, 63 S.Ct. at 1010. The Court noted that "[u]nlike other forms of expression, radio inherently is not available to all ... that is why, unlike other modes of expression, it is subject to governmental regulation." *Id.* at 226–227, 63 S.Ct. at 1014. The regulation of cable television bears similarity to that of radio in a number of ways. Such similarity is reflected in concern about physical scarcity—both specific to the locale at issue and as a broader national policy issue. Indeed, the history of regulation of broadcast and cable television indicates that scarcity need not be found in each geographical area in which a potential speaker wishes to speak in order to justify some regulatory scheme. *See*

*generally Red Lion Broadcasting v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371; *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344; *Pacific West Cable Co. v. Sacramento,* 798 F.2d 353 (9th Cir.1986); *Omega Satellite Products v. Indianapolis,* 694 F.2d 119; *Community Communications v. Boulder,* 660 F.2d 1370.

However, in the instant case there is substantial evidence in the record to demonstrate that there is real potential for physical scarcity in the public rights-of-way. Divander Kant, the City's Director of Community Development and Environmental Control, has testified that the underground easements on Singer Island are crowded. D. Kant Deposition, filed Feb. 28, 1989, at 81 ("there's so much in that right of way underground").[7] There are currently nine cable operators franchised to provide service in Palm Beach County; each is a potential applicant to the City. Affidavit of Dennis Widlansky, Director of Finance and Interim City Manager, City of Riviera Beach, filed March 19, 1990, at 3. At least six more operators are potential cable service providers to the City. *Id.*[8] Physical scarcity problems exist in relation to the City's rights-of-way.[9] By requiring cable operators to estimate the impact of the additional operator on existing users of the rights-of-way, the City can then determine whether telephone poles need to be extended, replaced, and re-guyed.[10] For example, a ten-foot horizontal clearance is required between pipes carrying fresh water and sewage; an eighteen inch clearance is required for vertical clearance. Affidavit of L. John Samadi, City Engineer for City of Riviera Beach, filed Mar. 20, 1990, at 4. Most states also require that coaxial cable for television service be at "least 3.5 to 4 feet below the grounded or neutral wire on the high-voltage electrical power cables, and at least one foot above any telephone wires." Affidavit of Pilnick, Feb. 28, 1989, at 33. The problem of physical scarcity cannot be solved simply by requiring additional rights-of-way; this may be prohibitively expensive and not easily accomplished. Affidavit of Pilnick, Feb. 28, 1989, at 37. It is not an option in Riviera Beach because the City does not have the financial resources to acquire additional rights-of-way. Widlansky Affidavit at 2, 3.

7. Later in his deposition, Kant described the Singer Island facilities as "very crowded." Kant Deposition at 84. He explained that the crowding is "because there's only one road that goes north-south, and it feeds very high density developments as well as single family and there's water, sewer, there's utilities, drainage, all kind of service utilities in the right of way." *Id.*

8. Widlansky cites to the Village of Royal Palm Beach, also located within Palm Beach County. The Village of Royal Palm Beach has a population of roughly 6,000 people contrasted with that of Riviera Beach, which is at almost 30,000. The Village currently has two franchised cable operators, each of which is franchised to serve the entire City, and there is an application pending for a third franchise. Widlansky bases his estimate of "at least six cable operators" seeking franchise on the number of franchised cable operators in Palm Beach County and the experience of the Village of Royal Palm Beach. *See* Widlansky Affidavit at 3.

9. L. John Samadi, City Engineer for Riviera Beach, stated:

In my capacity as City Engineer for the City, I am familiar with the problems associated with use of the City's rights-of-way by more multiple persons. At the present time, the underground rights-of-way in the City contain fresh water mains, raw sewage mains, cable television cables, drainage mains, electric lines and telephone lines. In addition, aerial rights-of-way in the City also contain installations of cable television cables, electric lines and telephone lines.
Affidavit of L. Samadi, filed Mar. 20, 1990, at 2.

10. In a study done by Carl Pilnick for Hillsborough County, Florida, he concluded that two or three additional coaxial cables in the right-of-way would saturate its capacity. Moreover, the cost of enlarging the existing rights-of-way would be extremely heavy. Affidavit of Feb. 28, 1989, at 37. In the instant case, fifteen percent of the utility poles on Singer Island will be subject to "make ready" requirements, including removal and replacement of existing service providers' equipment already on the poles. Affidavit of Peter Robert Gardner, Engineer Construction Supervisor for Comcast Cablevision, filed Mar. 19, 1990, at 2. In the remainder of the City, approximately thirty percent of the utility poles will be subject to "make ready" requirements, including removal and replacement of existing service providers' equipment already on the poles. *Id.*

On the face of this record of physical scarcity, Telesat supplies affidavits to support its argument that in fact the City's easements and rights-of-way have substantial unused capacities for expansion for various users.[11] Telesat disputes the City's claim that underground easements on Singer Island are already crowded. *See* Telesat's Statement Controverting Facts, at 5–6. Telesat's argument, we think, misses the mark. Even if the public rights-of-way have some unused capacity—and the Defendant City has offered much evidence indicating that physical scarcity is in fact a matter of real concern—the City plainly has an interest in regulating a resource that has important limits to its capacity. Moreover, regardless of the precise amount of space available for cable television lines on Singer Island, the City has considerable scarcity concerns throughout the municipality's boundaries to consider. We reiterate that the history of broadcast and cable television regulation demonstrates the danger of suggesting that there must be a precisely quantifiable scarcity in *each* geographical area in which a potential speaker wishes to speak in order to justify regulation.

We reject as well several of Telesat's contentions regarding facts in dispute on the scarcity issue. For example, Telesat challenges the validity of the opinions rendered by Carl Pilnick, primarily by claiming that his affidavits are based on "some unspecified hypothetical city or cites." Tele-

sat's Response at 4. First, experts may testify as to general practices and conditions based on their expertise. Fed.Rule Evid. 703. Moreover, Mr. Pilnick stated in his affidavit that his opinions are based on specific facts given to him by the City's engineering department. *See* Affidavit of Pilnick, May 16, 1990, at para. 14. We too have seen referenced facts supplied by Mr. Samadi of the City's engineering department.

In our view, it is reasonable for a municipality or governmental body to require, as the Defendant City has done here, the applicant to assess the space in rights-of-way in order to preserve its scarce rights-of-way for the greatest good. Such requirements are supported by important and substantial interests of the municipality.[12]

### B. *Public disruption*

Construction and operation of a cable television system is not passive; it can be an intrusive force on a franchising authority's rights-of-way. As the Tenth Circuit described its impact:

> a cable operator must lay the means of his medium underground or string it across poles in order to deliver his message. Obviously, this manner of using the public domain entails significant disruption, especially to streets, alleys, and other public ways. Some form of permission from the government must, by necessity, precede such disruptive use of the public domain. We do not see how it

---

**11.** *See* Affidavit of Michael Grella, senior planner for Post, Buckley, Schuh & Jernigan, Inc., Telesat expert on public rights-of-way survey, filed March 19, at 10 ("All of the utility poles which I observed contained sufficient space for the attachment of additional cable television lines ... the underground right-of-way in which State Road AIA is built could accommodate approximately 65 cable television lines if they were all buried the same depth and evenly spaced, 12 inches apart, throughout the right-of-way."); Second Affidavit of Paul Zitzmann, Construction Supervisor for Southern District of Telesat Cablevision, Inc., filed March 19, 1990, at 2 ("pole measurements reflect that there is ample room for the attachment of cable television facilities on 75 percent of the poles in a manner consistent with all applicable construction standards without any relocation of the facilities on the poles.... measurements also reflect that ample room for the attachment of

cable television facilities could be made on the remaining 25 percent of the poles by relocating facilities already on the poles.").

**12.** We note that while the Supreme Court in *Preferred* remanded the case for want of a more developed factual record, it cited to the City of Los Angeles argument

> that the physical scarcity of available space on public utility structures, the limits of economic demand for the cable medium, and the practical and esthetic disruptive effect that installing and maintaining a cable system has on the public right-of-way justified its decision to restrict access to its facilities to a single cable television company.

476 U.S. at 492, 106 S.Ct. at 2036. It is on such a fleshed-out factual record that we now grant the City's Motion for Summary Judgment.

could be otherwise. A city needs control over the number of times its citizens must bear the inconvenience of having its streets dug up and the best times for it to occur. Thus, government and cable operators are tied in a way that government and newspapers are not.

*Community Communications v. Boulder,* 660 F.2d at 1377–78. *See also Group W. Cable, Inc. v. Santa Cruz,* 669 F.Supp. 954, 971 (N.D.Cal.1987) (With respect to the city's request for financial information on operator, the district court found the city had "a substantial governmental interest in minimizing the physical disruption that could occur if a cable operator lacks the financial resources to install and maintain a cable system safely and expeditiously."). This interest, we think, is manifestly substantial.

Telesat argues, however, that its construction in fact causes minimal disruption in the City.[13] Even minimal disruption, however, would provide sufficient basis for the municipality to regulate, given the substantial and important government concerns raised by *any* public disruption. But to examine only current construction to ascertain the precise extent of public disruption would be to take too narrow a view of the issue in the case. The constitutionality of the City's regulations is not grounded solely on whether Telesat's construction

has been disruptive, but rather on whether construction of a cable television system in the City's rights-of-way in general can reasonably tend to disrupt. Again, the record adequately demonstrates the *potential* for disruption each time a cable operator would seek to wire the City. *See* Affidavit of Pilnick, February 28, 1989, at 36 ("cable equipment usually represents a permanent and substantial intrusion on or in the rights-of-way"); *id.* at 12 ("A lack of sufficient funds may delay or stop the system construction, resulting in a variety of inoperable equipment in the public rights-of-way and a lack of service to expectant residents."); Affidavit of Pilnick, March 19, 1990, at 7 ("All of these [aspects of cable television installation] intrude upon the public rights-of-way, to a greater and lesser extent. The pedestals, in particular, are a major source of subscriber unhappiness in many newly developed communities, where restrictive covenants against rooftop antennas are not uncommon, and cable service becomes a virtual necessity."); Affidavit of Pilnick, May 21, 1990, at 14 ("The relatively few municipalities in the United States that have franchised, in recent years, two or three cable television operators, have been forced to deal with these right-of-way access problems ... which involve rights-of-way capacity and disruption...."); Deposition of Divander Kant;[14]

---

13. The construction and maintenance of a cable system causes minor and limited disruption to a city's streets and rights-of-way, and causes significantly less disruption than installation of water systems, sewer systems, gas systems, underground and aerial electrical systems, and underground and aerial telephone systems. Underground installations of cable television lines across a street can be accomplished in a day or less, and an aerial installation adjacent to a residential lot typically requires less than 30 minutes. Disruption is typically even less where major streets or highways can be crossed underground through the use of pipe sleeves under the roadway.
Telesat's Statement Controverting Facts, at 24, *citing* Affidavits of Grella and Zitzman (Second Affidavit).

14. In the course of his deposition, Divander Kant, Director of Community Development and Environmental Control, made several statements which relate to the public disruption issue. When asked what would result from a cable company or any other easement user having the right to construct their facilities without any regulation by the City, Kant responded:
First of all, it's not feasible. It would just be chaotic.... [b]ecause then the city would have no control on who's doing what and what is being put in the right of way and ... [t]he whole service system could be disrupted because of construction or later repairs. This could be ongoing chaos for the city ... Depending on what the problem it would create, if there is a break, if the sewer line—sewer company was to go in and put in a sewer line and there is a rupture in the sewer line, it could blow up the street right-of-way, the island is disconnected, the north portion could be disconnected from the south, depending on where the problem is. Police, fire, health, sanitation facilities could be jeopardized.
Kant Deposition at 88. Kant also cited other specific examples of potential disruption, including, for example, sidewalk removal, in which case "we want to make sure that there is temporary passage for the pedestrian during the construction and we want to make sure that

Affidavit of L. John Samadi at 4.[15]

The City may also rely upon experiences in other jurisdictions in adopting legislation on similar subjects. *International Eateries of America, Inc. v. Broward County,* 726 F.Supp. 1568 (S.D.Fla.1989); *see also City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). And the City may consider factors not specifically included in the Ordinance's delineated criteria, including aesthetics, day-to-day side effects of construction including trenching and lawn and garden restoration, homes left with multiple aerial drops, multiple pedestals, and anchors and guy-wires in yards, as well as potential customer confusion from multiple operators. *Cf. Plain Dealer Pub. Co. v. Lakewood,* 794 F.2d 1139 (6th Cir.1986).

Again, we believe that the City has articulated important public interests stemming from concern about potential public disruption caused by cable operators' activities. Public disruption, like physical scarcity, are substantial government interests which the Ordinance is designed to address. These interests support a regulatory framework. And this Ordinance does so in a manner which is constitutionally permissible.

## V. *The Specific Requirements of the Regulations*

### A. Universal Service Requirement

■ The most hotly litigated aspect of the regulatory scheme codified by the Defendant City is the specific requirement that a cable operator provide universal service throughout the municipality's boundaries as a condition for being franchised. The City considers the universal non-discriminatory service requirement to be one of the most important aspects of the Ordinance. Basically, it requires that the grantee serve the entire territorial limits of the City and specifically mandates that

[a]ccess to cable service shall not be denied by any grantee to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

Ordinance, Section 11.55(a)(4). The City observes that Congress included such universal service language in the Cable Act,[16] precisely because it wanted to eliminate cable operators' refusal to provide cable service because of the income status of recipients in certain areas. *See* H.Rep. No. 934, 98th Cong.2d Sess. 59, *reprinted in* U.S.Code Cong. & Admin.News 1984 at 4696.[17] The City sought to apply this reasoning to the geographic and income demo-

---

after the work is completed the sidewalk is put back in proper shape." *Id.* at 82. Kant also noted the need to ensure that "the pedestrian flows continue without any danger to the pedestrians and that the traffic continues to flow without endangering either pedestrians or the drivers themselves." *Id.*

**15.** Samadi stated:

I am regularly confronted with the need of the City or some other right-of-way user to excavate within the right-of-way. Excavation is generally done by using a back-hoe. During an excavation, vehicular traffic within the surrounding area must be either detoured onto other streets or rerouted into different lanes of traffic.

... I am aware of plant within the right-of-way being damaged during the excavation process, including cutting of cable and telephone and electric lines. I am also aware of instances when the excavation in the right-of-way has ruptured water and sewage mains.... In my experience, on every road construction project, services disruptions to customers are caused at least twice. I am

also aware of several hundred pairs of telephone lines being cut during excavation in a right-of-way affecting close to three hundred customers.

Samadi Affidavit at 4.

**16.** The Cable Act provides:

In awarding a franchise or franchises, a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

47 U.S.C. § 541(a)(3).

**17.** The House Report stated:

In other words, cable systems will not be permitted to "redline" (the practice of denying service to lower income areas). Under this provision, a franchising authority in the franchising process shall require the wiring of all areas of the franchise area to avoid this type of practice.

House Report at 59, *reprinted in* U.S.Code Cong. & Admin.News at 4696 (1984).

graphics in Riviera Beach and suggests that the need for universal service is substantial. Specifically, the Defendant has argued that the universal service requirement promotes competition, tends to prevent or limit discrimination based on wealth or race, and provides the widest access for those who are willing and able to purchase the cable service.

On the other hand, Telesat counters that the City's argument on universal service was rejected by the District of Columbia Court of Appeals in *American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1580 (D.C.Cir.1987), *cert. denied sub nom. Connecticut v. FCC*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Telesat further argues that this requirement compels it to speak when it may choose to remain silent, in violation of the speech and press guarantees embodied in the First Amendment.

To begin with, what the District of Columbia Circuit said was that the Cable Act did not *mandate* universal service. There is *no* indication that universal service is precluded by FCC regulations. While the Court of Appeals observed that the FCC initially interpreted the Act to mean that franchising authorities were required to wire all areas, it held that such requirements were not absolute, citing to a subsequent FCC order which provided:

> the intent of [section 621(a)(3)] was to prevent the exclusion of cable service based on income and that this section does not mandate that the franchising authority require the complete wiring of the franchise area in those circumstances where such an exclusion is not based on the income status of the residents of the unwired area.

823 F.2d at 1579–80, *citing Notice of Proposed Rulemaking*, 49 Fed.Reg. at 48,769 and *Report and Order*, 50 Fed.Reg. at 18,647. The Court of Appeals noted that it read the House Report language to mean " 'wiring of all areas of the franchise' to *prevent redlining*." *ACLU*, 823 F.2d at 1580 (emphasis in original). This language does not suggest that a city is precluded from requiring universal service, particu-

larly in circumstances which indicate exclusion of cable service based on income.

The first interest posited by the Defendant City in support of the universal service requirement is that it is said to promote competition. Thomas Hazlett, Telesat's expert witness, has testified in some detail about the benefits said to flow to city residents of competition among cable operators. For example, Dr. Hazlett stated, "Competition in cable can be expected to benefit consumers even where no actual overbuild materializes." Telesat's June 1, 1989 Responses to the City's Second Set of Interrogatories, at 13. Dr. Hazlett also stated:

> Should Telesat, as a result of a typical business investment decision, decide to partially or fully overbuild the existing operator in additional portions of Riviera Beach, consumers can only be benefitted from the rivalry, as competition tends to lower prices and improve services offered, and—in any event—promotes consumer choice.

Deposition of Dr. Hazlett, filed May 21, 1990, at 66. In other writings, Dr. Hazlett specifically introduced discussion of low-income families as cable consumers. He wrote that " 'low-income families spen[d] more dollars on basic cable than d[o] middle-income families,' and ... that 'low income [urban] families may find that basic cable provides an inexpensive substitute for the other kinds of entertainment that the city offers.' " T. Hazlett, *Private Monopoly and the Public Interest: An Economic Analysis of the Cable Television Franchise*, 134 U.Pa.L.Rev. 1335, 1382 (1986) (citation omitted).

The City's universal non-discriminatory service requirement is said to ensure that *all* citizens of the City are the benefactors of competition and have access to the benefits of the diversity of communications offered by multiple cable operators, and that such service is available throughout the boundaries of the City. Deposition of William E. Wilkins, employed by the City of Riviera Beach from 1974 to 1987 in various positions, including City Manager, filed Feb. 28, 1989, at 90–91. The City argues that it ought to be permitted to use public

property in a manner reasonably designed to promote these interests. In addition, Section 166.046(2) of the Florida Statutes gives the City authority to franchise cable television systems and requires it to consider a number of enumerated criteria during the franchising process, including "societal interests as are generally considered in cable television franchising [and] ... other additional matters, both procedural and substantive, as the municipality or county may, in its sole discretion, determine to be relevant." *See* Fla.Stat.Ann. § 166.-046(2)(g), (h).[18]

In the second place, the City has offered evidence to support the claim that income- and race-based discrimination concerns are reasonable ones in Riviera Beach. The Cable Act explicitly states that "access to cable service is not [to be] denied to any group of potential residential cable subscribers because of income ..." 47 U.S.C. § 541(a)(3). The House Report language which accompanied the legislation specifically identified in this context the practice of denying service to lower income areas, or "redlining." And the Supreme Court has recognized unequivocally that government has a compelling interest in eradicating discrimination against its citizens. *See, e.g., Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987).

Singer Island, the sole area which Telesat serves, is a middle to high income, predominately white area of the City. The majority of these residents live in condominiums. Deposition of Wilkins at 135. The City has about 35,000 residents: sixty percent are black, forty percent are white. The City is 97 percent white in the area east of U.S. 1, which includes Singer Is-

land. Deposition of Wilkins at 91–92. The area west of Old Dixie is 95 percent black. The area between U.S. 1 and Old Dixie is 70 percent black. *Id.* at 92. On Singer Island, the mean income by workers is $59,-157 per annum; the city-wide average is $26,468 per annum. Affidavit of Karen J. Golanka, City Planner for City of Riviera Beach, filed Mar. 19, 1990, at 2, citing to the 1980 United States Census. There are, in short, divergences in income patterns between Singer Island and the rest of the City.

Moreover, cable operators tend to bring cable service to low income areas at a much slower rate than to other areas. Affidavit of Pilnick, February 28, 1989, at 17.

> While these tendencies may represent logical business decisions, they result in some portions of a municipality having cable service. This usually results in a considerable level of chronic complaints, directed at the municipality as well as the cable operator. Residents who do not have the cable service are aware that.... [t]he municipality has granted a franchise for cable service, and therefore presumably has some responsibility to assure that some residents are not discriminated against in favor of others.

*Id.* at 17–18.

The City asserts that absent a universal service requirement, some Riviera Beach residents may face a reduction in the quality of the cable television service they receive or possibly lose the service completely. Affidavit of Pilnick, March 19, 1990, at 4. This might occur, they suggest, because (1) a new operator, not required to serve the entire community, will not go into certain poorer areas which will then be denied the benefits of cable competition or (2) the

---

**18.** The statute subsection states:

(2) No municipality or county shall grant a franchise for cable service to a cable system within its jurisdiction without first, at a duly noticed public hearing, having considered:
(a) The economic impact upon private property within the franchise area;
(b) The public need for such franchise, if any;
(c) The capacity of public rights-of-way to accommodate the cable system;
(d) The present and future use of public rights-of-way to be used by the cable system;

(e) The potential disruption to existing users of the public rights-of-way to be used by the cable system and the resultant inconvenience which may occur to the public;
(f) The financial ability of the franchise applicant to perform;
(g) Other societal interests as are generally considered in cable television franchising;
(h) Such other additional matters, both procedural and substantive, as the municipality or county may, in its sole discretion, determine to be relevant.

operator currently serving those less profitable areas will concentrate its improvement of services and any additional investment in those areas which are more profitable and more affluent. *Id.* at 4. At all events, the City has posited that the Ordinance may reasonably tend to promote competition throughout its boundaries. The City has further suggested that it may rely on congressional findings concerning the *potential* economic and social implications of permitting cable operators to "redline" a community. *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986).

The constitutionality of universal service has been raised in only a handful of cases and the case authority is split. Most recently, the district court in *Preferred Communications* held such universal service requirements to be constitutional. *See Preferred Communications v. City of Los Angeles,* No. CV 83–5846–CBM, Memorandum Order, slip op., at 2 (C.D.Cal. March 26, 1991).[19] When another district court found the universal service requirement unconstitutional, notably it did so by analogizing cable television to newspapers, an analytic route which we have not taken. *See Century Federal, Inc. v. Palo Alto,* 710 F.Supp. 1552 (N.D.Cal.1987). In contrast, in our Order of January 12, 1990 in the instant case, we stated:

> It is also true that newspapers present few if any of the problems of physical scarcity or public disruption which may be found in the cable television medium. Indeed, several courts have posited a greater justification for regulation of cable television suggesting real distinctions between the widely available newspapers medium and the more limited medium of cable television.

*Id.* at 20.

While Telesat has vigorously argued that for purposes of this case cable operators should be treated exactly as newspapers, we are not convinced as to this basic point. In tracing the differences in regulating the different mediums, most courts refer to the substantial interest of government in controlling the timing and extent of any disruption of its streets and rights-of-way. In the instant case, we have already noted that the construction and maintenance of a cable system in a community burdens the public streets and rights-of-way in significant ways, and markedly different from the print media. Such issues have been addressed extensively elsewhere. The Tenth Circuit Court of Appeals, for example, distinguished precisely and in some detail between cable television and print media. In *Community Communications v. Boulder,* 660 F.2d 1370 (10th Cir.1981), the Court of Appeals stated:

> The attributes of cable broadcasting technology indicate that nearly absolute strictures against direct governmental regulation of newspapers' dissemination of information cannot be applied in wholesale fashion to cable operators. To disseminate information, a newspaper need not use public property in the same way that a cable operator does. A newspaper may reach its audience simply through the public streets or mails, with no more disruption to the public domain than would be caused by the typical pedestrian, motorist, or user of the mails. But a cable operator must lay the means of his medium underground or string it along poles in order to deliver his message. Obviously, this manner of using the public domain entails significant disruption, especially to streets, alleys, and other public ways. Some form of permission from the government must, by necessity, precede such disruptive use of the public domain.... Thus, government and cable operators are tied in a

---

**19.** Earlier versions with the same outcome appeared in *Preferred Communications, Inc. v. City of Los Angeles,* No. CV–83–5846–CBM, Order Re Defendants' First Amendment Motion for Partial Summary Judgment, slip op., at 6 (C.D.Cal. June 13, 1989) (the court "will not apply the 'print media' standard in deciding the constitutionality of [Los Angeles] cable franchising procedures, as it is not clear whether the operation of a cable system is as non-disruptive to the public domain as is the dissemination of newspapers."); *Preferred Communications, Inc. v. City of Los Angeles,* No. CV 83–5846–CBM, Memorandum Order, slip op., at 49 (C.D.Cal. January 5, 1990).

way that government and newspapers are not.

*Id.* at 1377–1378.

A district court in Rhode Island also contrasted the varying regulation of broadcast television, newspapers, and cable television. That court concluded:

> Newspapers and cable television cannot be equated. More to the point, the two media *are* constitutionally distinguishable. Although a cable operator's selection of its programming is similar to the editorial function of a newspaper publisher or a television broadcaster, this similarity does not mean that each medium is entitled to the same measure of First Amendment protection. "Each method of communicating ideas is a 'law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers of each method.'" *Citing Metromedia, Inc. v. San Diego*, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949)).... [Cable television] and newspapers first differ in that only the latter have historically operated virtually free from any form of government control over their content.... Cable television does not have a similar history of freedom from government regulation over either its operations or the content of its programming.... Indeed, government franchising of the cable television industry is virtually indispensable. For example, since construction of a cable television system requires use of public streets or telephone poles, the government has a substantial interest in limiting the number of cable operators who build cable systems.

*Berkshire Cablevision of Rhode Island v. Burke*, 571 F.Supp. 976, 985 (D.R.I.1983).

Public disruption issues aside, the courts repeatedly have allowed for differing treatment of broadcast and print media in the First Amendment area. In the most recent Supreme Court decision relating to cable television, the Court found constitutional an Arkansas general tax imposed on cable television services while specifically exempting receipts from subscription and other-the-counter newspaper sales and subscription magazines sales. *See Leathers v. Medlock*, —— U.S. ——, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). The petitioners argued that the tax discriminated among media in violation of the First Amendment, "even in the absence of any evidence of intent to suppress speech or of any effect on the expression of particular ideas." The Court stated: "[o]ur cases do not support such a rule." *Id.* 111 S.Ct. at 1445. It held that "the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting print media, does not violate the First Amendment." *Id.* at 1447. In *Omega Satellite Products Co. v. Indianapolis*, 694 F.2d 119 (7th Cir.1982), the Seventh Circuit considered a First Amendment challenge to a cable television ordinance and stated:

> The Supreme Court has interpreted the First Amendment to allow more government regulation of television than of theaters, movies, books, newspapers, or open-air address. *Compare Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), *with Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

694 F.2d at 127. The Seventh Circuit acknowledged a distinction between broadcast, to which *Red Lion* was devoted, and cable television but concluded nonetheless that cable television belongs more with the broadcast rubric of First Amendment analysis than it does with medium such as newspapers.[20] "[T]here are enough differences between cable television and the non-television media to allow more government regulation of the former." *Id.* at 128. *See*

---

**20.** The Court of Appeals detailed several reasons for its categorization of cable television, including the "type of interference—interference with other users of telephone poles and underground ducts.... the natural monopoly characteristics.... [and] the universal access to the home that television enjoys and a resulting need to protect children." *Omega Satellite Products*, 694 F.2d at 127, 128. (Citations omitted).

*also Chicago Cable Communications v. Chicago Cable Comm'n,* 879 F.2d at 1549 ("[E]ach medium of expression must be assessed by standards properly suited to it.").

The City also asserts that the universal service requirement supports the City's interest in providing the broadest access to a broad spectrum of information for its residents. The Supreme Court has stated that the goal of the First Amendment is to promote the "widest possible dissemination of information from diverse and antagonistic sources," *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945), to preserve "an uninhibited market-place of ideas" and to produce "an informed public capable of conducting its own affairs." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. at 390, 392, 89 S.Ct. at 1806, 1807. The congressional intent underlying the Cable Act is the same. *See* 47 U.S.C. § 521(2), (4). The City contends that the universal service requirement may promote the availability of diverse information to all its citizens. As the Court stated in *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), the First Amendment goal of "providing access to the marketplace of 'ideas and experiences' would scarcely be served by a system ... heavily weighted in favor of the financially affluent, or those with access to wealth." *Id.* at 123, 93 S.Ct. at 2096.

Finally it has been suggested that the universal service requirement furthers the City's important interests in controlling the nature and extent of any disruption to its streets and rights-of-way. It is clear that concerns about disruption are substantial and that the timing and scope of disruption generated by construction of a cable system fall within the lawful province of government authorities. Where and when city streets are dug up impinges upon legitimate state interests. The Ordinance at issue requires construction of a cable system throughout the city's boundaries and within a specified time period.

Moreover, the universal service requirement is consonant with the *O'Brien* standards in that it is "unrelated to the suppression of free expression." *United States v. O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. While Telesat alleges that the requirement is a content-based regulation which interferes with its editorial discretion to decide what its message will be and who will receive it, we do not agree. The interests said to be furthered by the universal service requirement include the City's stated intere.: in eliminating discrimination in the provision of cable service to the community of Riviera Beach, an interest explicitly recognized by Congress. The City also seeks to promote First Amendment values and maximize competition in the delivery of cable television services to residents who are willing to pay for the service and to control public disruption attendant to the provision of cable television. Such asserted justifications "have nothing to do with content." *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In determining content neutrality, the principal inquiry "is whether the government has adopted a regulation of speech [or conduct] because of disagreement with the message it conveys.... The government's purpose is the controlling consideration." *Id.* at 791, 109 S.Ct. at 2753 (citations omitted).

The principal argument advanced by Telesat to support its claim that the City's universal service requirement is a content-based regulation is that the regulation interferes with its editorial discretion to decide to whom, when, and where to distribute its cable programming. It cites for support to *Century Federal, Inc. v. Palo Alto,* 710 F.Supp. at 1555–56, and *Group W Cable, Inc. v. Santa Cruz,* 669 F.Supp. at 970–71. Both courts held that the universal service requirement unlawfully burdened the cable operator's editorial discretion and was content-based. However, in reaching these conclusions both courts applied the First Amendment standards normally applied to newspapers, again a standard which we have found inapplicable.

Telesat's claim that the City's universal service requirement is content-based be-

cause it forces Telesat to speak is not supported by the facts in this case. This is not a case where the City is requiring Telesat to carry programming. *See Quincy Cable TV, Inc. v. F.C.C.,* 768 F.2d 1434, 1437–38 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). The City's universal service regulation plainly does not force any cable operator "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). Telesat's real complaint is that the Ordinance requires it to construct a cable system in areas of the city where it may choose not to construct. With respect to Telesat's assertion that the substantial cost of compliance renders the universal service requirement content-based, we note that "in the absence of a showing of economic harm bordering on censorship, a dimunition of [Telesat's] profits does not itself present a First Amendment problem." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 49 n. 97 (D.C.Cir.1977). No such showing has been made in the instant action.

Telesat also argues that even if the requirements are considered content-neutral, they fail to meet either a substantial government interest or a rational basis test. *See* Telesat Opposition Memorandum at 54, 55. Telesat contends that the Cable Act does not require franchising authorities to impose "universal service" requirements. As we have discussed, while the Cable Act may not mandate universal service, it does *not* preclude a municipality from requiring universal service in the event that concerns about "redlining" arise. Telesat next asserts "forcing competition is not a legitimate government interest." Opposition Memorandum at 60. It contends that there can be no real interest by a municipality in promoting competition among cable operators. Plaintiff is plainly wrong in this assertion. An entire history of antitrust legislation belies the very premise Telesat posits.

Telesat also argues, in essence, that the City is not really interested in promoting competition and that the universal service requirement is instead motivated by the anti-competitive interests of the Defendant/Intervenor Comcast. Telesat basically maintains that the universal service requirement will dampen rather than promote competition, and that such a result would inure to the benefit of Defendant/Intervenor which currently provides cable service throughout the City of Riviera Beach. Telesat offers no facts in support of its claim. It simply asserts—inaccurately, we add—that the Defendants have offered no facts in support of the universal service requirement. Indeed, the City of Riviera Beach has offered facts, in the form of affidavits and deposition testimony from Wilkins, Hazlett, and Pilnick, that such requirements would benefit competition, as well as enhance the diversity of available viewpoints.

We are not prepared to substitute our judgment for a legislative determination as to the benefits of a universal service requirement. On the record before us, we are prepared to accept the determination made by the City. No empirical data has yet been adduced to suggest that the City is wrong. The Plaintiff merely asserts that the requirement would stifle rather than promote competition.

Telesat also argues that the Defendants have developed the universal service requirement in order to require Telesat "to eliminate the economic disadvantages which result from housing patterns which place blacks primarily in one geographic area and whites priminarily in another ... [that it is] a race conscious effort to require private property owners to eliminate the economic disadvantages, if any, which exist by virtue of geographic housing patterns." Telesat Opposition Memorandum, at 66. Such an assertion misses the mark. The universal service requirement will not redistribute income, it will not eliminate economic disadvantages; indeed, the City has made no representation that it seeks such ends. Rather, the City has made a determination that access to cable service may be denied based on a combination of income and geography of certain City residents and that a universal service require-

ment will tend to prevent or limit such discrimination. On the record before this Court, we are not prepared to say that this is irrational or unreasonable or that it does not tend to promote a substantial government interest.

Finally, Telesat asks this Court to apply *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) as a tool with which to analyze the City's regulatory scheme. This case is not *Richmond*. In *Richmond*, the City adopted a plan requiring prime contractors who were awarded city construction to subcontract at least thirty percent of the dollar amount of each contract to one or more "Minority Business Enterprises" defined as a business at least 51 percent of which is owned and controlled by black, Spanish-speaking, Asian, Indian, Eskimo, or Aleut citizens. *Id.* at 477–78, 109 S.Ct. at 712–13. The Supreme Court held the set-aside plan unconstitutional finding, among other things, that there was not a sufficient factual nexus between the proposed remedy and a prior history of racial discrimination. This case does not involve any kind of set-aside plan. There is no issue of government disgorgement of federal, state, or local contract money. There are no requirements as to minority-owned businesses or licensing. The City of Riviera Beach universal service plan requires only that cable lines be laid throughout the length and breadth of the City. *Richmond* is not helpful to an analysis of the questions presented here.

We believe that constitutional and statutory authority for a universal service requirement exists. The City has made sufficient showing that such a regulation may tend to further the City's interest in preventing discrimination in the provision of cable television services throughout the City of Riviera Beach, in controlling the timing and extent of any disruption to its streets caused by the construction of cable television systems in the City, and in promoting the widest possible dissemination of

ideas and cable programming from diverse sources to those who may wish to buy the service. The regulation is content-neutral; it does not suppress Telesat's right to free speech. Any burden placed on Telesat's First Amendment rights—which would be minimal, at any rate, since the regulation does not in any way affect Telesat's programming or viewpoint delivered over the cable system—is no greater than required to achieve the City's interests. In short, the universal service requirement meets all prongs of the *O'Brien* test. It is constitutional.

### B. City Franchise Fee

■ Under Section 11–55(a), the cable operator in Riviera Beach "shall pay the city five (5) per cent of the gross subscription revenue received by the company for cable television service provided to subscribers within the corporate limits of the city as now or hereafter constituted." City Code, Chapter 11, Article C (Ordinance No. 2335). Telesat has challenged the constitutionality of this provision too. The franchise fee requirement, however, simply recognizes the costs associated with the City's administration of the franchise and the reasonable rental value of the cable operator's use of the City's rights-of-way. Deposition of D. Kant, Feb. 28, 1989, at 88. Most users of the public rights-of-way in Broward County pay between three and five percent for franchise fees; for several, the rates are above five percent. *See* Affidavit of Robert B. Banting, real estate appraiser for Anderson & Car, Inc., filed Mar. 19, 1990, at 2, 3.[21] While Telesat does not argue these facts, it disputes the assertion that all users of the City's rights-of-way are required to be franchised by the City prior to installation of any structure in its rights-of-way. *See* Telesat's Statement Controverting Facts, at 4–5. First, it is not clear that the City has made such an assertion. Telesat seems to claim that because fee arrangements for other rights-of-way

**21.** For example, Florida Power & Light pays a six percent franchise fee in Boca Raton, Green Acres, Lantano, Lake Park, and County of Palm Beach, and it pays 6.5% in Boynton Beach.

Southern Bell pays franchise fees ranging from one to 6.5% in different Palm Beach County cities. Beach Service pays a ten percent fee in Delray Beach. *See* Affidavit of Banting at 2, 3.

users may not be encoded in the form of regulations like Ordinance 2335, the franchise fees for cable operators are somehow invalid. In *Erie Telecommunications, Inc. v. Erie*, 659 F.Supp. 580 (W.D.Pa. 1987), *aff'd on other grounds*, 853 F.2d 1084 (3d Cir.1988), the district court found that the constitutionality of the franchisee fee was not presumptively suspect, even if the City of Erie had not imposed similar franchise requirements on other commercial enterprises. 659 F.Supp. at 597. We agree. The City of Riviera Beach is clearly within its power in charging franchise fees for the commercial use of the public rights-of-way.

Governments regularly charge fees for the use of their property, including the use of such property for speech. *See Jarman v. Williams*, 753 F.2d 76 (8th Cir.1985); *International Soc. for Krishna Consciousness v. Schrader*, 461 F.Supp. 714 (N.D.Tex.1978). *Cf. Leathers v. Medlock*, 111 S.Ct. at 1444 ("The Arkansas sales tax is a tax of general applicability.... The tax does not single out the press and does not therefore threaten to hinder the press as a watchdog of government activity.... We have said repeatedly that a State may impose on the press a generally applicable tax.") Telesat concedes that the City may charge a rental fee, but argues that the fee at issue is not related to fair market rental of the public right of way. *See* Telesat's Statement Controverting Facts, at 6. Again, we disagree. The City has provided adequate evidence that its fee approaches the reasonable market value of the rental of its rights-of-way when compared with franchise fees for other utilities in Palm Beach County. *See* Affidavit of R. Banting, at 2, 3. Both administrative cost and reasonable rental value considerations are directed to the conduct aspects of a cable television operation; neither is in any way

related to speech. The franchise fee requirement falls within the provisions of the Cable Act and is constitutional.[22]

The constitutionality of such a franchise fee has been upheld by other courts. For example, in *Group W Cable, Inc. v. Santa Cruz*, 669 F.Supp. 954 (1987), the district court rejected a cable operator's challenge to a five percent franchising fee, citing to the authority provided by the Cable Act and noting the city's substantial government interest in charging a franchise fee.

> A cable franchise confers on the franchisee an interest in public property that differs significantly from the public's general right to travel over public streets ... A cable operator's license to use the public thoroughfare bears such indicia of a possessory interest as exclusiveness, durability, independence and private benefit. Thus [the City of] Santa Cruz has an interest in requiring compensation for the grant to a private entity of such an interest in public property.

*Id.* at 973 (citations omitted). Additionally, payment of the franchise fee should pose no burden to the cable operator since it may be passed on to its subscribers and even designated as such on its billing statements. 47 U.S.C. § 542(f). Pursuant to the provisions of the Cable Act, the City charges a franchise fee that is related directly to the cost of administering the franchise and which also relates to the fair rental value of its property and does not relate to speech. Deposition of Kant at 88. The fee is constitutional.

## C. Financial Capability and Feasibility

■ At the time of applying for a franchise, the applicant must demonstrate that it has clearly identified and earmarked funds for the construction and operation of the cable television system. Section 11–53(a)(3) of the Ordinance requires:

---

**22.** Section 542 of the Cable Act provides:
(a) Payment under terms of franchise
Subject to limitation of subsection (b) of this section, any cable operator may be required under the terms of any franchise to pay a franchise fee.
(b) Amount of fees per annum
For any twelve-month period the franchise fees paid by a cable operator with respect to

any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system. For purposes of this section, the 12 month period shall be the 12 month period applicable under the franchise for accounting purposes....

Information demonstrating the financial capability of the applicant to construct and operate the proposed cable system, including clearly identified, committed sources of financing available for the system, over and above all other financial commitments and resources of the applicant and any parent or affiliated organization of the applicant.

Section 11–53(a)(4) requires:

Information demonstrating the financial feasibility of the proposed cable system which shall include data on the economic demand for the proposed cable system, the existing and potential subscriber base to financially support the proposed cable system, and the effect, if any, on overbuilding of any existing cable system(s). Applicant should disclose all economic and demographic assumptions, facts, or factors which are incorporated in, or form the basis for, its demonstration of financial feasibility.

The City asserts that the applicant's financial capability to construct and operate the system is inextricably bound with demonstrating the system's financial feasibility. We see no reason to question the City's interest in requiring such information. The First Amendment does not prohibit a franchising authority from requiring a cable operator to demonstrate its own financial ability and its system's financial feasibility. *See Group W Cable, Inc. v. City of Santa Cruz*, 669 F.Supp. at 971 (District court rejected challenge to city's Request for Proposal requirement that "a prospective franchisee ... submit extensive information concerning ownership, finances and experience in the cable field and ten-year projections of operating costs and revenue."). As the district court noted in *Group W*, any city would have a substantial interest in minimizing potential physical disruption should "a cable operator lack the financial resources to install a cable system safely and expeditiously." *Id. See also Communications Systems, Inc. v. City of Danville, Kentucky*, 880 F.2d 887, 891 (6th Cir.1989) (Sixth Circuit affirmed entry of summary judgment for city where city acted with proper legisla-

tive discretion when it chose to award a cable franchise on findings including the cable company's "stable financial condition."); *Nor–West Cable Communications Partnership v. City of Saint Paul*, No. 3–83–CIV 1228, 1988 WL 241122 (D.Minn. Sept. 2, 1988) (applicant lacked standing to sue without first demonstrating financial capability). The financial capability and feasibility requirements are constitutional.

### D. Insurance, Bonding, and Indemnification Requirements

■ Section 11–55(b) of the Ordinance requires applicants to insure the City against any liability for losses arising out of the cable company's operation of its cable system. While Telesat challenges this provision too, we think the insurance provision is reasonable and rationally related to substantial governmental interests and is constitutional. The cable operator uses the rights-of-way owned by the City in the construction of the cable television system. The City remains the ultimate landowner, however, and is liable for injuries caused on its land. *See Camillo v. Department of Transp.*, 546 So.2d 4 (Fla. 3d D.C.A.1988) (government agency, as landowner responsible for maintaining street or sidewalk, has obligation to maintain street or sidewalk free from any obstruction of which it knows or should know, even though obstruction may have been created initially by third person); *Slemp v. City of North Miami*, 515 So.2d 353 (Fla. 3d D.C.A.1987) (once governmental entity builds or takes control of property or improvement, it has same common law duty as private person to properly maintain and operate property). The City requires that cable applicants have insurance in place to insure that any cable operator doing construction work in the City's rights-of-way perform that work in a workmanlike manner and in accordance with the building permit issued by the City. Deposition of Kant at 91. The City also requires cable operators to secure insurance to protect it from liability if people are injured in the course of the construction. *Id.* It is a means by which the City may recoup costs. *Cf. Post Newsweek Stations–Connecticut,*

*Inc. v. Travelers Ins. Co.,* 510 F.Supp. 81, 85 (D.Conn.1981) (contract provisions requiring television station not to broadcast footage of figure-skating championships until after network with exclusive broadcast rights had completed broadcast were not arbitrary, where civic center at which event occurred was not intended to exist as nonprofit institution and thus municipality was acting in proprietary capacity). Moreover, the bonding and insurance provisions are required of other users of the rights-of-way as well. *Id.* at 92.

Section 11.55(c) also requires cable operators to indemnify the City for any losses suffered due to installation of its system. While the City is not physically on site when a cable operator installs cable systems in its rights-of-way, it may still be liable for any damages which may be suffered due to the cable operator's actions. *See* Affidavit of Pilnick at 20–21. *See Coral Gables v. Prats,* 502 So.2d 969 (Fla. 3d D.C.A.1987) (contract by which City was engaged in construction required it to maintain sidewalks in good repair and in manner permitting pedestrian traffic without trip and fall hazards imposed nondelegable duty upon city to protect public from trip and fall hazards, even though city had delegated performance of the contract to an independent contractor); *see also Camillo v. Dep't of Transp.,* 546 So.2d 4.

Telesat baldly asserts that the City lacks a legitimate interest in singling out cable operators as the only public-rights-of-way users which must provide the City with insurance and bonds and indemnification to protect the City from liability. *See* Telesat's Statement Controverting Facts, at 13–14. The only evidence it offers in support of this claim is that Florida Power & Light is not required to post a construction bond when it expands its facilities in the City. *See* Deposition of Widlansky at 64–65. This is not enough. We believe that City has made a sufficient argument and introduced sufficient facts to show that requiring the cable operator to insure the City against potential losses arising out of the operator's use of the right-of-way is rea-

sonable and rationally related to what is surely a legitimate government interest. It is constitutional.

**E. Transfer and Assignability Restrictions**

■ Section 11.55(d) prohibits the franchise holder from transferring the franchise without the franchising authority's consent. By such a requirement the City seeks to prevent an operator from circumventing the detailed regulatory schemes which it has established by transferring the franchise to another party which does not meet the requirements. Plaintiff's Appendix to First Motion for Partial Summary Judgment at 429. Since a franchise is a contract, the regulatory authority has the right to determine with whom it will contract. *See, e.g., Palm Beach Mobile Homes, Inc. v. Strong,* 300 So.2d 881 (Fla. 1974) (right to contract and to use property are fundamental rights guaranteed by federal and state Constitutions, but degree of such guaranties must be determined in light of social and economic conditions prevailing at given time). The City also seeks to prevent trafficking in franchises and thereby maintain control of its rights-of-way. *See* Affidavit of Pilnick, Feb. 28, 1988, at 21. It is constitutional.

**F. Compliance with Applicable Laws and Ordinances**

■ Section 11–56 states:

Grantee shall, at all times during the life of this franchise, be subject to all lawful exercise of the police power by the City and to such regulation as the City shall hereafter provide, and grantee shall fully comply with all applicable laws, rules and regulations now in effect or hereinafter adopted by the Federal Communications Commission, the City, the State of Florida, and the United States.

This section does nothing more than recognize the dual regulation of cable television by federal and state authorities which has existed since 1972, as is recog-

nized specifically in 47 U.S.C. § 556.[23] This provision is a reasonable method of ensuring that the City's franchised cable operators are in compliance not only with the City's cable regulations, but also with all other applicable state and federal regulations. Failure to comply with concurrent regulations could affect the provision of cable television service in the City. For instance, the FCC has regulations on signal leakage while the City does not. Excessive signal leakage could damage the quality of cable television service provided to the City's residents. Affidavit of Pilnick, Feb. 28, 1989, at 22. Subsection (b) of Section 11–56, which requires production to the City of all communication between the franchise holder and other regulators is a reasonable and not excessively burdensome means by which to achieve this goal. Requiring the franchise holder to comply with all applicable state and federal laws surely imposes no additional burden.

Telesat maintains that the City may not impose and has no legitimate or substantial interest in sanctioning cable operators for failure to comply with City ordinances, because such sanctions would single out speech for different treatment. *See* Telesat Statement Controverting Facts, at 14. Again, Telesat fails to offer factual support for its assertion. On the record before this Court, we do not believe that the City's requirement unfairly singles out speech. Any impact on speech would be incidental.

## G. Ensuring System Operation and Maintenance

■ Section 11.57(s) regulates the operation and maintenance of the system by requiring the cable operator to "render efficient service [and] make repair promptly." The section also regulates provision of customer service, response time for service complaints, and maintenance of service records. The authority to enact such requirements is derived directly from the Cable Act. *See* 47 U.S.C. § 552.[24] The enforcement provisions of section 552 enable the franchising authority to include "provision for the enforcement of customer service requirements and construction-related requirements of the operator," as part of the franchise. H.R.Rep. No. 934, 98th Cong.2d Sess. 79, *reprinted in* U.S.Code Cong. & Admin.News at 4716.

The City's consumer protection requirements, each permitted by the Cable Act, accomplish several purposes for the City. First, they ensure that subscriber service meets some minimal service requirements. Affidavit of Pilnick, Feb. 28, 1989, at 15. Second, requiring compliance with minimum service standards should reduce the amount of time which the City must devote to regulating the franchise. These service requirements are standard in cable television franchises nationwide. *Id.* The City may lawfully regulate in this way. The provisions are constitutional.

## H. Maps, Plats, and Reports

■ Section 11–57 requires cable operators to submit to the City maps, plats, and

**23.** The statute section states, in part:
 **(a) Regulation by States, political subdivisions, State and local agencies, and franchising authorities**
 Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter.
 **(b) State jurisdiction with regard to cable services**
 Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable service consistent with this subchapter.

**24.** The section provides:

(a) Inclusion of enforcement provisions in franchise.
 A franchising authority may require, as part of a franchise (including a franchise renewal, subject to section 546 of this title), provision for enforcement of—
(1) customer service requirements of the cable operator, and
(2) construction schedules and other construction-related requirements of the cable operator.
(b) Enforcement powers of franchising authority.
 A franchising authority may enforce any provision, contained in any franchise, relating to requirements described in paragraph (1) or (2) of subsection (a) of this section, to the extent not inconsistent with this subchapter.

reports. The requirement is imposed not only on rights-of-way users in the City of Riviera Beach, but is common to users of rights-of-way in most cities. Affidavit of Pilnick, Feb. 28, 1989, at 28. The submission of such information allows the City to assess the applicant's activities and potential disruption in the rights-of-way. Deposition of Kant, Feb. 28, 1989, at 95–96. This in turn enables the City to ensure that the rights-of-way to be used physically can accommodate the proposed construction and that the proper clearances are maintained among the various installations. The maps, plats, and reports also help prevent disruption of services being provided by other users of the rights-of-way. Feb. 28, 1989, affidavit of Pilnick at 27–28.[25] The City could notify other occupants of the rights-of-way that construction is about to commence and allow them to take any actions necessary to protect their own equipment. *See generally* Affidavit of L. Samadi, at 3–4.[26] Maps also help determine the number of homes passed and such information would allow the City to check the accuracy of franchise fees being paid to the City. Affidavit of Pilnick, Feb. 28, 1989, at 27. The regulation is reasonable and constitutional.

## I. Requirements for Public, Educational, and Governmental Channels

Section 11.58 requires cable operators to provide service to schools and public hearings.[27] Section 11.67 provides that one station will be designated for public programming.[28] These sections appear to us to be content-neutral, related to an important interest, and thus constitutional. Congress specifically granted franchising authorities the right to require public access channels through the Cable Act.[29] Congress considered the First Amendment implications of this requirement in enacting the Cable Act. The House of Representatives report which accompanied the legislation states:

The development of cable television, with its abundance of channels, can provide the public and program providers the

25. "[W]hen a cable company attempts to place its cables underground, it is not uncommon to accidentally cut the cables of other utilities, and disrupt service for some period of time." Affidavit of Pilnick, Feb. 28, 1989, at 35.

26. "In some older communities, accurate maps and records are not even available to show the location and nature of underground utility facilities, and the layer upon layer of major items in the ground." Affidavit of Pilnick, Feb. 28, 1989, at 37.

27. Grantee shall install and provide basic service through one basic standard service drop to each public school, fire station, police station, and city administration building within the city for educational or governmental purposes upon request by the city and at no cost to the city or the public school system. Any internal distribution system within the building to which the free service is provided shall be at the expense of the party receiving the service and will be installed by grantee at cost upon request. Grantee may, at its election, provide similar services without cost to private schools, including parochial or religious schools.

28. Specifically, the section requires:
Within one (1) year from the date of the award of a franchise hereunder, but not before December 31, 1990, grantee shall designate in writing and activate one (1) channel for use by the City, in common with other franchising authorities, for the broadcast by the City or such other franchising authority, or its duly established designee, of such public, educational or governmental programming as desired from time to time by the City or other franchising authorities utilizing the said channel, and shall have reasonable access to such channel on a part with other franchising authorities having access to such channel.

29. Section 531 provides:
(a) Authority to establish requirements with respect to designation or use of channel capacity.
A franchising authority may establish requirements in a franchise with respect to the designation or use of channel capacity for public, educational, or governmental use only to the extent provided in this section.
(b) Authority to require designation for public, educational, or governmental use.
A franchising authority may in its request for proposals require as part of a franchise, and may require as part of a cable operator's proposal for a franchise renewal, subject to section 546 of this title, that channel capacity on institutional networks be designated for educational or governmental use, and may require rules and procedures for the use of the channel capacity designated pursuant to this action.

meaningful access that, up until now, has been difficult to obtain. A requirement of reasonable third-party access to cable systems will mean a wide diversity of information sources for the public—the fundamental goal of the First Amendment—without the need to regulate the content of programming provided over cable....

... Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic marketplace of ideas with the opportunity to become sources of information in the electronic marketplace of ideas.

H.R.Rep. No. 934, 98th Cong.2d Sess. 30, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 4667.

In *Chicago Cable Communications*, 879 F.2d 1540, cable operators challenged the franchising requirement that cable operators provide local origination programs—programming originated in and around Chicago. Analyzing the First Amendment challenge against the requirements of *O'Brien*, the Seventh Circuit upheld the constitutionality of the local origination requirement. The Court of Appeals observed:

[T]he LO requirements in this case assure community participation in the production and programming of cable television. Promotion of community self-expression can increase direct communication between residents by featuring topics of local concern. Encouragement of "localism" certainly qualifies as an important or substantial interest.

879 F.2d at 1547. The court also noted the potential employment opportunities for local residents fostered by such a requirement and concluded that "[a]ll of the above objectives of the LO rules are important and substantial concerns of the City, thereby satisfying the relevant second prong of *O'Brien.*" *Id.* at 1547. *See also CBS, Inc. v. FCC*, 453 U.S. 367, 397, 101 S.Ct. 2813, 2830, 69 L.Ed.2d 706 (1981) (court upheld access requirements for candidates for federal office saying limited access "does not impair the discretion of broadcasters to present their views on any issue or to carry any particular type of programming"); *United States v. Midwest Video Corp.*, 406 U.S. 649, 651, 92 S.Ct. 1860, 1862, 32 L.Ed.2d 390 (1972) (the Court upheld local origination programming requirements on the grounds that they could increase "the number of local outlets for community self-expression and [augment] the public's choice of programs and types of service, without use of broadcase spectrum").

The public, educational, and governmental ("PEG") access requirements of the City's ordinance have been shown to be rationally related to a substantial government concern. The City has listed a variety of goals for the requirements, including: permitting fuller citizen participation in government by increasing information of government activities, encouraging the dissemination of diverse information, permitting the dissemination of information by public schools and universities to the communities in which they are located, and permitting access to the public for groups whose views might otherwise not be expressed due to limited financial resources or lack of popularity. Like the PEG channels, the requirement that cable operators provide free service to governmental buildings—schools, fire stations, police stations, and the like—expand available sources of information, multiply the diversity of viewpoints, and thus foster First Amendment interests. The ordinance does not require that cable operators provide supporting facilities and equipment; it does not impose an unduly heavy financial burden. Affidavit of Pilnick, Feb. 28, 1989, at 29. Since it requires only one channel—out of a total of forty to fifty channels—to be devoted to public access, it also has little impact on the cable operator's programming choices. *Id.*

In short, Telesat's argument that the City has no reasonable or legitimate interest in requiring a cable operator to provide cable service to schools and public buildings is without merit. The case law, the explicit language of the Cable Act, and the legislative history which accompanies the

Act all support the constitutionality of these provisions.

### J. Emergency Use of Facilities

■ Under Section 11.59 of Article II of the Ordinance, the City seeks to ensure that it has the ability to communicate with its citizens during an emergency.[30] In an emergency, the government attempts to inform people of the actions which they can take to protect their safety and welfare. In a coastal community such as Riviera Beach, residents of the City are vulnerable to hurricanes, floods, or other natural disasters. Cable television is one means to reach a large portion of the population in such an emergency. This kind of access has been employed during tornados in the Midwest, hurricanes in the South, and emergency situations such as toxic spills, major fires, and traffic accidents. *See* Affidavit of Pilnick, Feb. 28, 1989, at 25. Some cable companies have their own reserve power supplies; and in some cases, cable may be the sole means by which to communicate with local residents when the primary source of electrical power fails. *Id.* Nevertheless, Telesat suggests that the City cannot impose such requirements because "virtually all media organizations voluntarily cooperate with government entities when disaster strikes." Telesat's Statement Controverting Facts, at 19. Again, we disagree. That media usually volunteer to help in such situations in no way undermines the right of local governments to mandate such assistance. These regulations too are rationally related to a substantial government interest.

### VI. *Equal Protection*

■ In addition to its First Amendment claims, Telesat maintains that the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment. First Telesat contends that the Ordinance impermissibly treats cable operators differently than other public rights-of-way users by imposing requirements on cable operators which are not imposed on non-cable rights-of-way users. Second, Telesat argues that cable users are singled out impermissibly for regulations which are not applied to other types of First Amendment speakers. Third, Telesat avers that new franchises are subject to the Ordinance while incumbent franchisees are not. In addressing this argument in our Order of January 12, 1990, we stated:

> The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 786 [313] (1982) [ (1985) ]. Disparate treatment of different businesses may withstand First Amendment scrutiny where there is a difference in the type of conduct engaged in by the different businesses. *See also Alamo Rent–A–Car v. Sarasota–Manatee Airport Authority,* 825 F.2d 367, 370 (11th Cir.1987).

> In the instant case, a myriad of factual questions exist as to whether the use of rights-of-way for cable operations differs significantly from other uses for rights-of-way. We have previously discussed ... the types of factual issues which require resolution in the present action. . . . [T]he determination of Telesat's Due Process claims requires the same type of factual explication which is necessary for the determination of Telesat's First Amendment claims.

*Id.* at 32. We have made that factual explication with respect to the First Amendment claims, finding that the facts support the City's Motion for Partial Summary Judgment. Given the record discussed already with respect to the attributes of cable television operations and the differences between cable television speakers and other types of speakers, we find

---

**30.** Section 11.59 states:

In the case of any emergency or disaster, grantee shall, upon request of the Mayor or City Manager, make available its facilities to the City for emergency communications use during the emergency or disaster period.

Grantee will provide a radio or character-generated signal override capability which will facilitate audio or video communications with all subscribers of grantee during such emergency.

Telesat's equal protection claim to be without merit.

The classification at issue in this action is related to substantial government interests. The City, the Florida legislature, and the Congress have classified cable operators as a distinct class. All of these legislative bodies have enacted laws directly solely to the providers of cable television service. Clearly, there is sufficient basis for such classification, and thus we are bound to uphold the ordinance. *See Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). A law may only be declared unconstitutional on an equal protection basis if the different treatment which results can only be declared totally arbitrary. *See Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Walters v. City of St. Louis,* 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660 (1954). No such conclusion can be reached in the instant case.

Additionally, the City treats all easement users similarly. It requires that they all be franchised and all receive building permits from the City. Deposition of Wilkens at 71, Deposition of Kant at 7. All users of the City's rights-of-way pay franchise fees and must comply with its ordinances. Deposition of Wilkens at 75, 101, Deposition of Widlansky at 32–33. At the present time, Telesat is the only cable operator to apply to the City under the Ordinance. No other similarly situated persons—applicants for cable television franchises under the Ordinance—exist for equal protection analysis.

## VII.

In sum, we believe that the City of Riviera Beach has made the necessary showing that the Ordinance is within the constitutional power of the City government, that it furthers important government interests which are unrelated to freedom of expression, and finally, that any incidental restriction on such expression is no greater than necessary. We find specifically that there is sufficient evidence in the record with respect to public disruption and physical scarcity issues to allow the City to regulate cable franchise operations as it has chosen to do, and we further find sufficient basis for the universal service requirement. In short, the Ordinance is constitutional in all respects challenged by Telesat.

Accordingly, for the foregoing reasons, Plaintiff Telesat's Motion for Partial Summary Judgment is DENIED, Defendant City of Riviera Beach's Motion for Partial Summary Judgment is GRANTED, and Defendant/Intervenor GWC 104, Inc.'s Motion for Partial Summary Judgment is GRANTED. The Defendant City of Riviera Beach is directed to submit a proposed Order of Final Judgment within fifteen (15) days of the date of this Order.

DONE AND ORDERED.