**CHARTER COMMUNICATIONS, INC., a Delaware corporation; Charter Communications Properties, LLC, a Colorado limited liability corporation; and Paul G. Allen, an individual, Plaintiffs,**

v.

**COUNTY OF SANTA CRUZ, Defendant.**

**No. 99CV1874.**

United States District Court, N.D. California.

Jan. 11, 2001.

Ann E. Johnston, Richard R. Patch, A. Marisa Chun, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA, for Plaintiffs.

Dwight L. Herr, County Counsel, Samuel Torres, Jr., County Counsel of Santa Cruz, Santa Cruz, CA, William M. Marticorena, M. Katherine Jenson, Jeffrey Melching, Robert S. Bower, Rutan & Tucker, Costa Mesa, CA, for Defendant.

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ALSUP, District Judge.

**INTRODUCTION**

In this action for infringement of plaintiffs' First and Fourteenth Amendment rights of free speech under 42 U.S.C.1983, and affiliated state-law contract claims, this order denies plaintiffs' motion for

summary judgment and denies defendant's motion for summary judgment.

## STATEMENT

This case arises out of defendant County of Santa Cruz's denial without prejudice of consent to plaintiff Paul G. Allen's 1998 purchase of the outstanding shares of a cable operator, plaintiff Charter Communications, Inc. ("CCT"). At the time of the purchase, CCI owned plaintiff Charter Communications Properties, Inc. ("Charter"), which pursuant to a written franchise agreement, ran and operated a cable system in the County of Santa Cruz. Under the franchise agreement, the County's consent was required for the transfer but could not be "unreasonably withheld." The meaning of that phrase is the crux of this dispute.

On May 19, 1998, the County entered into cable television franchise agreement with Charter, which had obtained the Santa Cruz "South County Franchise" from a company called Sonic Cable. As part of that agreement, the County and Charter negotiated and agreed to: (1) a new franchise agreement (Joint Exh. 4.b); (2) a rate order limiting Charter's ability to raise cable rates in the county over the next ten years (Joint Exh. 4.c); and (3) a transfer agreement in which CCI, as Charter's corporate parent, guaranteed Charter's obligations under the franchise agreement and rate order. The franchise agreement incorporated the terms of the County's cable ordinance, as will be discussed further below, requiring Charter to obtain the County's prior consent to any change in control of Charter, but prohibiting the County from withholding such consent "unreasonably."

Just over two months later, on July 29, 1998, Paul G. Allen contracted with CCI and certain of its affiliates to purchase approximately 95% of the outstanding shares of CCI as part of a more than $4 billion acquisition that would result in a common ownership of all of the cable properties then managed by CCI under a single umbrella company. On July 30, 1998, Charter and CCI notified the County of the transaction. The letter to the County includes an assurance that CCI's existing management group would remain in place after the transaction (Joint Exh. 8). On August 18, 1998, plaintiffs submitted a fully-completed FCC Form 394 to the County, requesting County's consent to the transaction (Joint Exh. 9). Form 394 is a document designed by the Federal Communications Commission to provide franchising authorities with information necessary to establish the legal, technical and financial qualifications of a proposed transferee.

On or about August 26, 1998, representatives of CCI met with the County's special counsel, William Marticorena, to discuss the transaction. CCI notes that it advised the County that it needed to close the transaction by the end of the year (Foushee Decl. ¶¶ 17). Apparently at that same meeting, Marticorena requested that Charter and Allen agree to pre-fund a due diligence financial study by an independent consultant, and proposed that William Morgan perform the study (Marticorena Decl. ¶ 3). Marticorena's declaration states that Charter did not object and seemed agreeable to the concept as eliminating any possibility of bias (*ibid.*). In early September, Marticorena faxed Charter a proposal regarding the due diligence financial study (*id.* ¶ 5). At a follow-up meeting on September 15, 1998, Marticorena reminded Charter of the immediate need for due diligence financial study, and provided Charter with an additional copy of the proposal by Morgan (*id.* ¶ 6). Charter, apparently, indicated it would review the proposal and respond promptly (*ibid.*). Also at some point after August 26, Charter expressed hesitation about Morgan's

impartiality and suggested that another expert be chosen. It did not reject the idea of an independent consultant altogether, however, in any of several conversations with Marticorena before October 5, 1998 (*id.* ¶ 7).

Meanwhile, on September 1, 1998, the County sent plaintiffs a request for further information "regarding the potential economic impact of said Transfer upon the rates which will be, or may be, charged for the provision of regulated and unregulated services within the Franchising Authorities. More specifically, and without limitation, the Franchising Authorities is [sic] concerned whether the Transfer, considering its totality of its economic impacts, will preclude or impede Charter from realizing a reasonable return..." (Joint Exh. 10).

On September 17, 1998, plaintiffs submitted a response to the September 1 information request (Foushee Decl. ¶ 25, Exh. 14). Although the response contained detailed financial statements, ten-year projected income statements, assurance that no new debt would be incurred to finance the Transaction, information on the cable systems in which Allen owned a controlling interest, explanation of Allen's role in the company, and information regarding the calculation of the sales price (Foushee Decl. ¶ 25), it did not mention the due diligence study. On October 5, 1998, Marticorena wrote to Charter warning that delay regarding the independent due diligence financial study could result in a delayed or adverse decision regarding the transfer application (Joint.Exh. 15).

On November 2, 1998, the County sent plaintiffs two more information requests. One was focused on the due diligence financial study request. The other asked for further information justifying the income projections provided in plaintiffs' last submission. (Joint Exhs. 16–17). On November 3, 1998, Charter wrote the County expressing uneasiness with proposed ex-

pert Morgan's impartiality and noting that County had not responded to the resume of alternate consultant that Charter stated it had faxed to the County on October 1, 1998 (Joint Exh. 18 at SC 002455–56).

On November 12, 1998, the County wrote a letter to plaintiffs. The letter stated:

> After consultation with Staff of each of the Franchising Authorities, it is becoming increasingly clear that the Staffs will not be in a position to make a positive recommendation of approval to the legislative bodies of each of the Franchising Authorities prior to the conclusion of the 120–day review period. There are numerous issues relating to the technical and financial qualifications of the Buyer as well as various compliance issues which may well preclude an approval within the 120–day timeframe. As opposed to a recommendation of denial without prejudice *so that these issues can be further pursued,* Staffs are willing to recommend a thirty to sixty day extension of the review period so that the parties can utilize this time to address the various issues which have been identified to you in my prior correspondence, as well as future issues which may come out of continuing compliance audits, toward the goal of crafting a mutually-acceptable transfer agreement. If Charter and the Buyer are willing to entertain such an extension, please contact me as soon as possible since agenda deadlines are quickly approaching for the meetings at which the legislative bodies for each of the Franchising Authorities will take action.

(Foushee Exh. D at SC 002450–51) (emphasis added).

In a telephone call shortly thereafter, Charter advised the County of plaintiffs' objections to the County's further demands, stating Charter's position that the

County already had more than sufficient information to make their decision and that no further responses would be provided and no extension of time could or would be given for the County to act on plaintiffs' consent request (Joint Stmt. 5 ¶ 26; Foushee Decl. ¶ 29). The general substance of this conversation was confirmed by Charter in two letters dated December 1, 1998, which also made clear that plaintiffs would not fund the due diligence study and further explained why they were taking that position (Joint Stmt. 5–6 ¶ 27, Exhs. 19 and 20).

On December 8, 1998, the County adopted a resolution denying without prejudice plaintiffs' consent request (Joint Exh. 21). No representatives of plaintiffs attended the December 8 meeting of the County's Board of Supervisors (Joint Stmt. 6 ¶ 30). The resolution was adopted without discussion as part of the "consent calendar" (Joint Stmt. 6 ¶ 31). This was 112 days after Charter formally requested the County's consent and 82 days after Charter responded to the County's September 1, 1998, information demand.

On or about December 15, 1998, the County issued another board resolution advising plaintiffs that the County would re-open the issue and consent to the transaction prior to the closing date. Two conditions were attached to such approval: (1) that Charter agree to a further rate freeze, and (2) that Charter make a "mitigation payment" of "approximately 5% of the difference between the per subscriber purchase price of Sonic and the sale price to Paul Allen multiplied times the number of subscribers," or approximately $500,000 (Exh. 23). Charter did not accept these conditions (Vossmeyer Decl. ¶ 5).

The parties' accounts of how this offer arose differ sharply. Representatives of the County characterize the demands as a settlement offer. County Counsel Marticorena states that he received a telephone call from plaintiffs' counsel Richard Patch, who had a history of constructively doing business with the County, stating that he now represented plaintiffs and requesting a meeting to facilitate resolution of the issue (Marticorena Decl. ¶¶ 3, 6). Marticorena states that Patch emphasized the importance of closing the transaction before the end of the year and that Marticorena gained an understanding that he was being asked to participate in good faith settlement negotiations (id. ¶ 4). Accordingly, Marticorena states, he went to the County's Board of Supervisors who, in response to plaintiffs' "unsolicited overture" to compromise, adopted the December 15, 1998, resolution and delegated approval authority to the County administrative officer based on those terms (id. ¶ 5). Marticorena states that he re-emphasized the "off the record" nature of the discussions at the December 17, 1998, meeting to discuss the offer (id. ¶ 7). Plaintiffs, on the other hand, opine that there was no discussion of potential litigation at the meeting and that discussion was not couched in terms of settlement (Vossmeyer Decl. ¶ 5). They assert that at the meeting "there was no request made, or agreement given, that the discussions at this meeting were 'off the record' or comprised a 'settlement communication.' Rather, Charter merely inquired as to what conditions the County would require for its consent prior to the close of the Charter/Allen Transaction" (ibid.). At that point, plaintiffs state, they were provided with a copy of the December 15 resolution and informed of its terms, which they considered "outrageous" (ibid.).

On December 23, 1998, the transaction closed (Joint Stmt. 6 ¶ 32, Foushee Decl. ¶¶ 33). Approximately one month later, on January 28, 1999, a precursor to this lawsuit was filed by plaintiffs. Plaintiffs amended the complaint in that lawsuit on

March 4, 1999, striking requests for certain impermissible damages and attorneys' fees. On March 9, 1999, the County issued preliminary notice that the closing of the transaction without the County's consent constituted a material breach of the franchise and could result, without limitation, in the revocation of the franchise and the imposition of liquidated damages (Exh. 24, Foushee Decl. ¶ 35). On March 12, 1999, the County filed a motion to dismiss the first amended complaint. On April 12, 1999, plaintiffs filed a voluntary dismissal of that suit without prejudice. On April 15, 1999, this action was filed. On November 12, 1999, this Court granted the County's motion to dismiss in part and denied it in part, dismissing a takings claim as unripe, and Cable Act claims because the Cable Act does not provide a private right of action. 74 F.Supp.2d 937. Plaintiffs were allowed to proceed on their First Amendment and breach of contract claims. During discovery, plaintiffs revealed that an independent due diligence financial study had in fact been performed on behalf of Allen in connection with the transaction, but had never been provided to the County (Marticorena Reply Decl. ¶¶ 3–7).

## ANALYSIS

A court should grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Many of the documents and events that outline the basic structure of this case are undisputed. The intentions, discussions, and negotiations behind those documents, however, remain murky. Summary judgment is inappropriate where the ultimate fact question (here, whether the information requests were reasonably necessary) as well as

some of the underlying facts is unsettled. *Sankovich v. Life Insurance Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

The central issue remaining in this case in regard to both the First and Fourteenth Amendment and the breach of contract causes of action is whether the County's consent to the proposed transaction was "unreasonably withheld." Because the denial without prejudice was based upon plaintiffs' refusal to comply with the County's information requests and the demand for an independent financial study, this assessment, in turn, depends upon whether those requests for more information were reasonably necessary.

Reasonably necessary information that the County was entitled to request is limited to information that would realistically further the Board's ability to assess permissible factors regarding whether to approve the transaction. Information that would not contribute to the Board's understanding of permissible factors and would merely be helpful in expanding their general understanding of the transaction would not be reasonably necessary, and it would be impermissible to deny consent based on plaintiffs' failure to provide such information. *Group W Cable, Inc. v. City of Santa Cruz*, 669 F.Supp. 954, 971 (N.D.Cal.1987).

Section 617 of the Cable Act (codified at 47 U.S.C. 537 and referred to hereinafter as "Section 537") provides:

Sales of Cable Systems

A franchising authority shall, if the franchise requires franchising authority approval of a sale or transfer, have 120 days to act upon any request for approval of such sale or transfer that contains or is accompanied by such information as is required in accordance with Commission regulations and by the franchising authority. If the franchising author-

ity fails to render a final decision on the request within 120 days, such request shall be deemed granted unless the requesting party and the franchising authority agree to an extension of time.

47 U.S.C. 537.[1]

The Federal Communications Commission has promulgated regulations that clarify the requirements of Section 537:

> Time limits applicable to franchise authority consideration of transfer applications.
>
> (a) A franchise authority shall have 120 days from the date of submission of a completed FCC Form 394, together with all exhibits, *and any additional information required by the terms of the franchise agreement or applicable state or local law* to act upon an application to sell, assign, or otherwise transfer controlling ownership of a cable system.
>
> (b) A franchise authority that questions the accuracy of the information provided under paragraph (a) must notify the cable operator within 30 days of the filing of such information, or such information shall be deemed accepted, *unless the cable operator has failed to provide any additional information reasonably requested by the franchise authority within 10 days of such request.*
>
> (c) If the franchise authority fails to act upon such transfer request within 120 days, such request shall be deemed granted unless the franchise authority

and the requesting party otherwise agree to an extension of time.

47 CFR 76.502 (emphasis added).

The County of Santa Cruz has also enacted a cable ordinance that addresses the situation of a change in control of a franchisee, codified in the Code of the County of Santa Cruz, Chapter 5.24 (Joint Exh. 1). The cable ordinance provides, in relevant part:

> M. Nontransferable. The franchise shall not be sublet or assigned, nor shall any of the rights or privileges therein granted or authorized be leased, assigned, sold or transferred, either in whole or in part, nor shall title thereto, either legal or equitable, or any right, interest or property therein, pass to or vest in any person, except the grantee, either by act of the grantee or by operation of law, without the prior written consent of the grantor, *which consent shall not be unreasonably withheld.* The granting of consent shall not render unnecessary any subsequent consent. *The grantor shall promptly request and the grantee shall furnish such information as the grantor reasonably requests in connection with such transfer.* Failure of the grantor to act within sixty days of receipt of such requested information shall be deemed the consent of the grantor thereto.
>
> N. Change in Control.
>
> 1. The grantee shall promptly notify the grantor of any proposed change in

---

1. Some of the relevant purposes of the Cable Act are to:

> (2) establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community;
>
>    \*    \*    \*    \*    \*    \*
>
> (5) establish an orderly process for franchise renewal which protects cable opera-

tors against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established [in the Act]; and

> (6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. 521(2), (5) and (6).

control of the grantee. *Such change in control shall make the franchise null and void unless and until the grantor shall have consented thereto subject to the provisions of paragraphs 2 and 3 of this subsection, which consent shall not be unreasonably withheld. The grantor shall promptly request and the grantee shall furnish such information as the grantor reasonably requests in connection with such change of control.* Failure of the grantor to act within sixty days of receipt of such information shall be deemed the consent of the grantor thereto.

Code of the County of Santa Cruz 5.24.030(M)-(N) (emphasis added).[2]

The franchise agreement entered into between Charter Communications Properties, LLC, and the County of Santa Cruz, effective May 19, 1998, incorporates the provisions of the cable ordinance in full as part of the terms and conditions of the franchise agreement, except in the event of inconsistency between the two, in which case it is provided that the terms of the franchise agreement shall prevail (Joint Exh. 4 at CHART 1797). The parties have not pointed to any provision of the franchise agreement that is inconsistent with the relevant terms of Section 5.24.030 of the cable ordinance. Additionally, the transfer agreement between Charter Communications Properties, LLC, Charter

Communications, Inc. the County of Santa Cruz., and former owner Sonic Cable T.V. Corporation and Sonicvest, effective when the Transfer from Sonic to Charter closed, also preserves the County's right to approve subsequent changes in ownership or control of the franchise (Joint Exh. 4 at CHART 1853–54).[3]

The County's argument for summary judgment is that the information requests *were* reasonable as a matter of law. In particular, the County advocates a standard of review granting substantial deference to the Board of Supervisors' legislative judgment, which, the argument goes, would mandate summary judgment for the County even if there are factual disputes as long as the County's actions were supported by substantial evidence. In support of this argument, the County cites *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 520 U.S. 180, 195–96, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (*"Turner II"*), and *Telesat Cablevision, Inc. v. City of Riviera Beach*, 773 F.Supp. 383, 405 (S.D.Fla. 1991).

The appropriate First Amendment standard to evaluate a content-neutral restriction that incidentally burdens a cable provider's speech is intermediate scrutiny. *Turner Broadcasting System, Inc. v. Federal Communications Commission,*

**2.** Section 5.24.030, Paragraphs (N)(2) and (3), provides a standard for when a change in control exists as well as remedies for violation. Neither of these issues is disputed for the purposes of this motion.

**3.** The transfer agreement provides:

3. The granting of consent to the Transfer does not waive the right of the County to approve any subsequent change in the ownership or control of the Transferee and there shall be no further material change of the Transferee which requires prior consent of the County pursuant to the Franchise and Chapter 5.24 of the Code of the County

(the "Ordinance") without the further written consent of the Board of Supervisors. The foregoing requirements shall not apply to any sale, assignment or transfer which relates exclusively to the financing of the Franchise and/or the System and relates exclusively to the financing of the Franchise and/or the System and does not materially affect the continued role of Charter Communications, Inc. in the management and operation of the cable system. Grantee shall provide a minimum of thirty (30) days notice of any transaction subject to this provision.

(Joint Exh. 4 at CHART 1853–54).

512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("*Turner I*"). Such a restriction, if, as here, enacted pursuant to statutory authority, will be sustained "if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Ibid.* (quoting *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). This standard, of course, takes into account the fact that such restrictions are the result of a legislative process to which deference must be accorded. As *Turner II* notes, the deference to the predictive judgments of Congress is greater than the deference accorded to, for example, an administrative agency. 520 U.S. at 195, 117 S.Ct. 1174. Such deference is appropriate in part because Congress is "far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Ibid.* (citations omitted). Nonetheless, the Supreme Court conducted a searching review of Congress's legislation under *O'Brien* intermediate scrutiny, remanding *Turner I* to the district court for additional fact-finding on whether the interests asserted by Congress were merely conjectural or were real and would be directly alleviated by the regulation at issue. 512 U.S. at 664, 114 S.Ct. 2445. No more deference is warranted in this case (especially because it appears on this record that the Board of Supervisors' action, although partially legislative in nature, was also partially administrative). Similarly, in regard to the contract claim, the franchise agreement (incorporating federal and local law) in this case limited the County to information that was *reasonably necessary*. This standard has a built-in level of deference, but does not mandate judicial deferral to a franchising authority's subjective interpretation of reasonableness. Because, as discussed further below, weighing of evidence and factual determinations will be necessary to determine whether the information requests in this case satisfied the *O'Brien* test and were reasonably necessary, summary judgment in favor of the County is inappropriate.

Plaintiffs' first argument for summary judgment is that, under the Cable Act and relevant FCC regulations, the County's information requests were unreasonable because they exceeded the scope of information that the County was entitled to seek. Specifically, plaintiffs argue, federal law restricted the County's review to the information provided in FCC Form 394, submitted by Charter on August 18, 1998. The County, on the other hand, argues that Form 394 is intended to provide an initial disclosure of necessary information (which *may* end up being sufficient) rather than to contain the complete universe of information to which a reviewing authority is entitled. To the extent that plaintiffs argue that Form 394 is meant to provide both the beginning and the end of permissible information requests under the Cable Act, they are incorrect. The FCC has stated that:

> Our implementing rules provide for commencement of the 120–day period when the cable operator has submitted a completed FCC Form 394 and any additional information required by the terms of the franchise agreement or applicable state or local law.... [L]ocal franchise authorities are permitted to request additional information *they deem reasonably necessary* to determine the qualifications of the proposed assignee or transferee, but ... requests for information not explicitly required by the franchise agreement or local law will not toll the statutory 120–day limitation unless

the franchise authority and the cable operator agree to an extension of time. *In the Matter of Implementation of Sections 11 and 13 of the Cable Television Consumer Protection and Competition Act of 1992, FCC Memorandum Opinion and Order on Reconsideration of the First Report and Order,* MM Docket 92–264, 10 F.C.C.R. 4654 ¶ 50 (1995) (emphasis added).

The express authorization (contained in the regulations promulgated by the FCC) to request clarification of unclear or inaccurate information in the Form 394, although certainly one example of information a franchising authority may permissibly seek, similarly does not function as an outer limit of "reasonably necessary information" that renders the County's information requests in this case clearly impermissible. 47 CFR 76.502. Additionally, to the extent that plaintiffs argue, as they do in their reply brief, that the County did not reasonably need to request additional information to that provided on Form 394, they do not significantly advance the ball in regard to summary judgment. The fact question whether the information requests were reasonably necessary is an issue to be decided, not assumed.

Plaintiffs' second argument relates specifically to the County's information requests targeted at assessing the impact of the proposed transfer of future cable rates. Plaintiffs argue, first, that these information requests were unreasonable because they constituted impermissible rate regulation. It is true that a franchising authority's ability to regulate rates is significantly restricted by federal law. 47 U.S.C. 543. That is not to say, however, that it is impermissible for a franchising authority to *take into account possible rate impact* in reviewing a proposed transfer of ownership. Deciding to reject a proposed transfer because it is extremely likely to result in increased rates or decreased service is not the same as regulating rates after a transfer has been approved or as a condition of a transfer. *Telesat Cablevision,* 773 F.Supp. at 408. Second, plaintiffs argue that even if reviewing rate impact is permissible in theory, the information requests targeted to that end were unreasonable in this case because the existing, recently negotiated, franchise agreement and rate order already restricted cable rate increases and guaranteed certain levels of service. This is a strong argument. The County rightly notes, however, that the degree to which those guarantees would effectively satisfy its concerns—for example, the degree to which the rate guarantees would remain effective despite plaintiffs' gaining control of the franchises to which Santa Cruz rates were indexed—is much more clear with hindsight. The extent to which the County's questions about those topics were unreasonable at the time is a fact question for trial.[4]

Additionally, plaintiffs argue that even if the initial information requests could be interpreted as reasonably necessary, the County's December 15, 1998 offer—suggesting terms that are undisputedly outside the bounds of what is permitted as part of a controlling authority's evaluation of a transfer application—was beyond the pale. Furthermore, plaintiffs argue, not only should summary judgment be granted on the issue of the December 15 offer in and of itself, but also that offer casts sufficient doubt on the County's motives

---

**4.** A further question that may be presented at trial is what result would be appropriate if some of the County's information requests were reasonably necessary and some were not, and plaintiffs refused to respond to the reasonable along with the unreasonable. The Court declines to address this point, currently unbriefed by the parties, unless and until it is presented at trial.

in making the initial information request that summary judgment in favor of plaintiffs is merited altogether. Indeed, if evidence produced at trial (including, for example, testimony from supervisors based on later-taken depositions and not available for the summary judgment record) showed that the requests for information, the November 12, 1998, request for an extension of time to make the decision, and the denial without prejudice of the transfer—were part of a holdup with the ultimate goal of extracting the otherwise impermissible concessions outlined in the December 15 resolution, that would certainly show the information requests not to be reasonably necessary and to warrant judgment for plaintiffs. It is equally possible at the summary judgment stage, however, that the December 15 offer was not in the Supervisors' minds at the time of the denial without prejudice, and that it was indeed a good faith attempt to meet plaintiffs halfway and arrive at a mutually acceptable resolution. The evidence on this issue, however, currently consists of factually inconsistent opposing affidavits, presenting a question of material fact for trial. At a minimum, however, the present record will not support the conclusion that the December 15 resolution and related discussions should be excluded as settlement negotiations under Federal Rule of Evidence 408.

Finally, plaintiffs argue that the December 8 denial without prejudice did not constitute a final decision under the Cable Act and thus that the transfer was "deemed granted." As discussed at the December 21, 2000, hearing, the denial without prejudice was likely a final decision if it was based in good faith on plaintiffs' failure to provide information. If it was intended to aid in extracting illegal concessions later on, of course, the decision would be unreasonable and plaintiffs would prevail.

## CONCLUSION

Plaintiffs' motion for summary judgment is **DENIED**. Defendant's motion for summary judgment is **DENIED**. The trial will proceed as scheduled.

**IT IS SO ORDERED.**